**CAPITAL IMAGING ASSOCIATES, P.C., Plaintiff–Appellant,**

v.

**MOHAWK VALLEY MEDICAL ASSOCI-ATES, INC., Mohawk Valley Physicians Plan, Inc., Defendants–Appellees.**

**No. 414, Docket 92–7639.**

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1992.

Decided June 10, 1993.

Phillip G. Steck, Albany, NY (Mark E. Watkins, Cooper, Erving, Savage, Nolan & Heller, Albany, NY, of counsel), for plaintiff-appellant.

William G. Kopit, New York City (Clifford E. Barnes, Epstein, Becker & Green, P.C., New York City, J. Edward Neugebauer, Washington, DC, of counsel), for defendants-appellees.

Before: NEWMAN, CARDAMONE, and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

We have before us on this appeal a claimed violation of the Sherman Antitrust Act. Certainly one strand of the philosophical underpinning leading to the passage of that Act is derived from the thinking of John Stuart

Mill, who, in his influential essay "On Liberty," observed: "trade is a social act. Whoever undertakes to sell any description of goods to the public, does what affects the interest of other persons, and of society in general; and thus his conduct, in principle, comes within the jurisdiction of society," J.S. Mill, *On Liberty,* Chapt. V, 303 (Harv.Class., Eliot ed., 1909). Plainly, not all competitive conduct that injures another allows resort to laws regulating trade. Antitrust law is not intended to be as available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it. Determining whether conduct allegedly in restraint of trade violates the Sherman Act requires careful analysis and fine discernment between those actions that generally tend to inhibit competition and those that either tend to promote it or at least not injure it. Such an analysis is our task on the present appeal.

A private radiology group brought this antitrust action in the district court against a health maintenance organization and the group of physicians organized to provide medical care to the health plan's enrollees. The radiologists complained that they were improperly excluded from providing services to the patients of the health care purveyor. Such exclusion, they argued, constituted a violation of the Sherman Act. After limited discovery, the district court granted the defendants summary judgment. In so doing, it examined only the "vertical" relationship between the health maintenance organization and its physicians' association, which the plaintiff radiologists argue was error. Although we agree with the radiology group that certain "horizontal" aspects of the defendants' practices improperly were not considered, we affirm the judgment of the district court, though for somewhat different reasons, because it reached the correct result.

## BACKGROUND

### A. *The Parties*

Capital Imaging Associates, P.C. (Capital, plaintiff or appellant) is a private radiology group of doctors who practice in Latham, a suburb of Albany, located at the northern tip of Albany County, New York, only a few miles from the borders of Schenectady, Saratoga, and Rensselaer Counties. Capital operates as a referral practice, that is, its physicians do not treat their own patients; rather, they supervise the performance of diagnostic radiological procedures on patients referred to the group by general clinicians, interpret the resulting images, and report their findings to the primary care physicians. The radiology group offers a full range of diagnostic imaging services, including such specialized radiological procedures as ultrasound, Magnetic Resonance Imaging (MRI), and Computerized Axial Tomography (CAT) scanning. The only comparable full-service radiology practice within a 100–mile radius of Albany County is Two Rivers Radiology, P.C. (Two Rivers), which has two offices, one in Rensselaer County and the other in Albany County directly across the street from Capital in Latham.

Mohawk Valley Medical Associates (Mohawk Valley, defendant or appellee) is an independent association of private physicians providing medical care to over 100,000 enrollees in appellee Mohawk Valley Physicians Health Plan (Plan). Mohawk Valley and the Plan were defendants at the district court. Together the physicians' association and the Plan constitute an independent practice association (IPA) model health maintenance organization (HMO). Under the IPA–HMO arrangement, the managed health care purveyor (in this case the Plan) contracts with the physicians' practice association, Mohawk Valley, to provide a full range of medical services for the HMO's enrollees, who must then go to Mohawk Valley physicians for all their medical care needs.

According to the terms of their agreement, the Plan purchases medical services from Mohawk Valley at a fixed contract or capitation rate per individual health plan enrollee. Although the arrangement among the Mohawk Valley physicians apparently does not permit price competition among the doctors, the capitation system promotes efficiency and is viewed as pro-competitive because it gives the independent practice physicians an incentive to keep medical costs down. That is, unless Mohawk Valley agrees to a suffi-

ciently low capitation rate, the Plan will be unable to compete with other health care providers in the private insurance market, in which case the Mohawk Valley physicians will not receive a steady stream of patients and income from the HMO. *See generally U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589 (1st Cir.1993) (describing HMO cost containment procedures).

In order to operate as an HMO in New York, the Plan was required to apply for and receive a certificate of authority from the New York State Department of Health (Department). The Department regulates HMOs to ensure that patients are afforded with comprehensive and continuous medical care. It also certifies the service area within which an HMO may offer its benefits package. *See* N.Y.Pub. Health Law § 4402 (McKinney 1985). At the commencement of this lawsuit, the Plan was licensed to operate in several central and upstate New York communities, but not in Albany County.

Mohawk Valley is also regulated by the Department. In accordance with state law it is obligated to, *inter alia,* staff itself with physicians and other health care professionals as necessary to meet the full needs of the Plan's enrollees, and to establish credential requirements for membership in its practice association. Consonant with these obligations, Mohawk Valley promulgated standards for admission of doctors into its association. To be admitted, a member physician must have (1) privileges in hospitals participating with the Plan, (2) offices within the state-certified service area, and (3) staff and facilities to provide adequate and continuous care to Plan patients. Limited exceptions to these admission requirements have been made when a pressing need exists for additional primary care physicians or specialists.

An application for membership is reviewed by the Mohawk Valley credentials committee, which makes a recommendation to its board of directors. According to the association's guidelines, the board may either approve the admission request or inform the applicant that it intends to deny it. If the board chooses the latter course, the applicant may request a hearing, during which he or she may present materials to support the application.

### B. *The Complaint*

This litigation came about as a result of the denial of appellant Capital's application for membership in Mohawk Valley. Appellant alleges that on February 24, 1987 it sent a written request for admission into the practice association, which was denied on July 21 because Capital was located outside of the Plan's designated service area. According to Capital, its application was spurned without prior notice and an opportunity for a hearing before the association's board of directors, procedures mandated by Mohawk Valley's standards for admission. Moreover, appellant contends the purported reason for denial is inconsistent with the Plan's description of its service area in its promotional literature to enrollees and with Mohawk Valley's treatment of other Latham-based physicians seeking membership.

In support of that contention, Capital points out that following the veto of its admissions application, it was asked to bid on an exclusive one-year contract to provide imaging services for Mohawk Valley. In October 1987 the association's board of directors rejected Capital's bid and voted instead to award the contract to Two Rivers because Two Rivers' bid was $40 per scan lower. Appellant believes the bidding process was flawed and provides further evidence of appellees' hostility towards it.

As a result of these events, on December 5, 1988, Capital commenced the instant litigation against both appellees in the United States District Court for the Northern District of New York (McCurn, C.J.). The complaint alleged that commencing September 1986 and continuing to the present time, appellees, along with Two Rivers and other unnamed parties, engaged in a conspiracy to exclude Capital from membership in the independent practice association. According to Capital this action constitutes an unlawful combination in restraint of trade in violation of § 1 of the Sherman Act and an attempt to monopolize trade and commerce in violation of § 2 of the Sherman Act. The complaint further alleged that these activities violate

New York State's General Business Law and the common law barring unfair competition.

### C. Prior Proceedings

Appellees made a motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and for failure to state a claim under Rule 12(b)(6). They also moved, in the alternative, for summary judgment under Fed. R.Civ.P. 56 on the ground that there were no genuine issues of material fact. In a memorandum and order dated November 28, 1989, the district court granted the Rule 12(b)(6) motion with respect to Capital's claim of monopolization under Sherman Act § 2 because the court found it to be "against logic." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs. (Capital I),* 725 F.Supp. 669, 678 (N.D.N.Y.1989). By contrast, it held that Capital's allegation of antitrust conspiracy under Sherman Act § 1 was sufficient to withstand a dismissal motion. With respect to this claim, the court reserved decision on appellees' motion for summary judgment and granted Capital limited discovery under Fed. R.Civ.P. 56(f). *Id.* at 679–80.

Following the completion of discovery, appellees renewed their motion for summary judgment, which the district court then granted on May 8, 1992. *See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs. (Capital II),* 791 F.Supp. 956, 967–68 (N.D.N.Y.1992). In so doing, the court noted that the plaintiffs demonstrated neither an illegal antitrust combination nor an unreasonable restraint of trade—the two essential elements to a § 1 claim. *Id.* at 968. The only evidence of a conspiracy to exclude Capital from membership in Mohawk Valley was the imaging award to Two Rivers and even if, as Capital alleged, the bidding process was flawed, it did not indicate, so the district court thought, an unlawful conspiracy, especially in light of Capital's concession that the contract between Two Rivers and Mohawk Valley was not in itself an antitrust violation. *See id.* at 963–64. In reaching the conclusion that Capital failed to demonstrate an unreasonable restraint of trade, the court reasoned that the Plan's and Mohawk Valley's exclusivity practice constituted "a vertical, non-

price restraint" and that such a restraint needed to be analyzed under the rule of reason. *Id.* at 964 (quoting *Capital I,* 725 F.Supp. at 677). Employing such rule, it held that Capital, "as a preliminary matter, must demonstrate that defendants have significant market power in the relevant market," and determined that the plaintiff failed to come forward with such proof. *Id.* at 966–67. The trial court stated that even though appellees' conduct may have adversely impacted appellant as an individual competitor, competition as a whole was not harmed. It refused to entertain Capital's state law claims since, having dismissed the federal causes of action, it had discretion to decline to exercise pendent or supplemental jurisdiction over them. *See id.* at 968. This appeal followed.

### DISCUSSION

#### I Summary Judgment in the Antitrust Arena

■ Because this appeal arises from a grant of summary judgment dismissing a complaint, we discuss the rules guiding application of that remedy in the antitrust context. Capital appeals only that portion of the final order summarily dismissing its § 1 antitrust cause of action. Several courts have noted summary disposition of antitrust cases is difficult to obtain because of their inherent factual complexity. *See Hayden Publishing Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 68 (2d Cir.1984); *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1409 (9th Cir.), *cert. denied,* 112 S.Ct. 617 (1991). But that does not mean summary disposition is thereby precluded or even disfavored in antitrust law; rather, as the Supreme Court observed in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 593–94, 106 S.Ct. 1348, 1355–57, 1359–60, 89 L.Ed.2d 538 (1986), summary judgment remains a vital procedural tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces. *See Oksanen v. Page Memorial Hosp.,* 945 F.2d 696 (4th Cir.1991) (*en banc*), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *Indiana Grocery, Inc. v.*

*Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989).

Summary judgment is appropriately entered for the moving party as a matter of law when all the papers before a trial court show that there are no genuine issues of material fact. Fed.R.Civ.P. 56(c). The litigant seeking summary disposition of a case bears the initial burden of demonstrating, through affidavits or otherwise, the absence of genuine factual issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the non-moving party then has the obligation to produce probative evidence supporting its view that a dispute exists. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . , the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (quoting Fed.R.Civ.P. 56(e)). In the context of antitrust litigation the range of inferences that may be drawn from ambiguous evidence is limited; the non-moving party must set forth facts that tend to preclude an inference of permissible conduct. *Id.* at 587–88, 106 S.Ct. at 1356–57; *accord Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

■ Our role is to determine whether the district court correctly ruled that there was no genuine factual issues for trial as to Capital's claim of a § 1 Sherman Act violation, thereby entitling the appellees to judgment as a matter of law. *See H.L. Hayden Co. of N.Y. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). In carrying out this task, we view the evidence in a light most favorable to appellant, the non-moving party, *see Burtnieks v. City of New York*, 716 F.2d 982, 985 (2d Cir.1983), and apply a *de novo* standard of review to ensure that the substantive antitrust law was correctly applied. *See Hayden*, 879 F.2d at 1011.

## II  The Sherman Act, § 1

### A.  Overview

■ In reviewing the substantive law, it is initially useful to set out the general contours of § 1 of the Sherman Act (Act), which states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1 (1988). Thus, according to the statute, a plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities. Unilateral conduct on the part of a single person or enterprise falls outside the purview of this provision in the antitrust law. *See Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Belfiore v. New York Times Co.*, 826 F.2d 177, 181–82 (2d Cir.1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988). For that reason, an agreement between a parent corporation and its wholly-owned subsidiary or its agents is not a concerted action for purposes of the Act. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984).

■ If a § 1 plaintiff establishes the existence of an illegal contract or combination, it must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason. Conduct considered illegal per se is invoked only in a limited class of cases, *see Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2551, 53 L.Ed.2d 568 (1977), where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are "conclusively presumed illegal without further examination." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). *Per se* violations include, for example, horizontal and vertical price-fixing, *see United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 841, 84 L.Ed. 1129 (1940); *Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U.S. 373, 405, 31 S.Ct. 376, 383, 55 L.Ed. 502 (1911); division of a market into territories, *see United States v. Topco Assocs.*, 405 U.S. 596, 609, 92 S.Ct.

1126, 1134, 31 L.Ed.2d 515 (1972); certain tying arrangements, *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984); and some group boycotts involving concerted refusals to deal with a competitor, *see Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 211–12, 79 S.Ct. 705, 708–09, 3 L.Ed.2d 741 (1959). In discussing group boycotts the Supreme Court cautions against application of the *per se* rule against professional associations because the economic impact of professional activities is so difficult to track. *See Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986).

■ Most cases fall outside these narrow, carefully demarcated categories held to be illegal *per se*. In the general run of cases a plaintiff must prove an antitrust injury under the rule of reason. Under this test plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice. Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors. *See, e.g., Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343–44, 110 S.Ct. 1884, 1893–94, 109 L.Ed.2d 333 (1990); *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir.1992). Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability. *See Oksanen*, 945 F.2d at 708; *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986) ("antitrust laws are not balm for rivals' wounds").

■ After the plaintiff satisfies its threshold burden of proof under the rule of reason, the burden shifts to the defendant to offer evidence of the pro-competitive "redeeming virtues" of their combination. 7 Phillip Areeda, *Antitrust Law* ¶ 1502, at 371 (1986); *accord Bhan*, 929 F.2d at 1413. Assuming defendant comes forward with such proof, the burden shifts back to plaintiff for it to demonstrate that any legitimate collaborative objectives proffered by defendant could have been achieved by less restrictive alternatives, that is, those that would be less prejudicial to competition as a whole. *See Bhan*, 929 F.2d at 1413; *see also Kreuzer v. American Academy of Periodontology*, 735 F.2d 1479, 1493–95 (D.C.Cir.1984); Areeda, *supra*.

Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior. The classic articulation of how the rule of reason analysis should be undertaken is found in *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), where Justice Brandeis speaking for the Supreme Court said:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

This classic test is easier to state than to apply. It at least seems clear that the factfinder must decide the overarching question of whether the challenged action purports to promote or to destroy competition. Resolving this under the rule of reason approach requires a careful and complete analysis of the competitive effects of the challenged restraint.

Capital avers it has set forth enough facts to meet its threshold burden of showing that appellees' actions constituted an antitrust conspiracy; it also contends it has demonstrated an unreasonable restraint of trade

under the rule of reason sufficient to withstand appellees' motion for summary judgment. It further asserts that in finding no horizontal antitrust conspiracy, the district court was led by this error into employing an improper analytical approach to the rule of reason, focusing too narrowly on appellees' market share.

### B. *Contract, Combination or Conspiracy*

We address this contention in light of the § 1 principles just reviewed. Our attention is first directed to whether the district court's failure to find an antitrust conspiracy was predicated on its erroneous focus on the vertical relationship between the health Plan and Mohawk Valley, the physicians' group with which it contracted. *See Capital II*, 791 F.Supp. at 963; *Capital I*, 725 F.Supp. at 677. This ordinary contract between a buyer and seller of medical services at different levels in the market structure, Capital itself acknowledges, poses few antitrust problems. But, its argument goes, the district court ignored the antitrust concerns that arise from the horizontal collaboration of competing independent physicians that make up the roster of Mohawk Valley. This association of sellers of medical services, Capital continues, conspired illegally to boycott Capital, another seller of the same medical services.

Appellees have two responses to appellant's allegation of horizontal collaboration. Initially, they declare the physicians associated with Mohawk Valley are a single entity economically, incapable of forming a § 1 conspiracy among themselves. Next they declare that even were this not to be the fact, appellant failed to proffer sufficient proof of an actual illegal horizontal boycott to negate permissible inferences of proper conduct on appellees' part.

■ 1. *Capacity to Conspire.* The first question is—are member physicians of an independent practice association legally capable of conspiring among themselves? We think the answer is "yes," they have such a capacity. The nature of the combination here at issue is similar to that described in *Bolt v. Halifax Hosp. Medical Ctr.*, 891 F.2d 810 (11th Cir.), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). The

plaintiff physician in *Bolt* was denied staff membership and privileges in several Florida hospitals, just as Capital here was denied membership in Mohawk Valley's practice association. Dr. Bolt filed suit alleging the defendant hospitals conspired with their medical staffs to restrain competition in violation of § 1 of the Sherman Act. The Eleventh Circuit ruled that nothing prevents members of a medical staff from conspiring, if they are so inclined, with one another. Each doctor practices medicine in his or her own individual capacity; each is a "separate economic entity potentially in competition with other physicians." *Id.* at 819; *accord Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455–56 (11th Cir.1991).

The Fourth Circuit sitting *en banc* similarly recognized that hospital staff physicians have independent and competing economic interests. When such is the case, the court reasoned, the doctors are not a single entity, as Mohawk Valley insists it is, and have the ability "to conspire as a matter of law." *Oksanen*, 945 F.2d at 706. But in *Oksanen* the conspiratorial capacity was not found as a fact because the physicians lacked final decisionmaking authority, that authority having been vested in the hospital board of directors. *Id.* Hence, the defendant doctors were corporate agents of the hospital and not separate economic actors. *Cf. Copperweld*, 467 U.S. at 769, 104 S.Ct. at 2740–41.

The reasoning of *Bolt* and *Oksanen* is persuasive and we adopt it. Mohawk Valley is a multi-member association of competing doctors, including radiologists, all of whom are in private practice for themselves and who allegedly joined together to deny Capital access to the HMO's patients. As members of an independent practice association, the doctors are not staff physicians employed by the HMO on a salaried basis, that is, they are not agents of the HMO. Instead, these health care professionals are independent practitioners with separate economic interests. *See* Clark Havighurst, *Doctors and Hospitals: An Antitrust Perspective on Traditional Relationships*, 1984 Duke L.J. 1071, 1073 n. 3 (describing HMO arrangements with physicians). Accordingly, the physicians associated together in Mohawk Valley had the

capacity to conspire among themselves much like the members of the medical staff in *Bolt.*

■ 2. *Actual Conspiracy.* Our finding of a legal capacity to conspire does not resolve the issue of whether § 1 of the Sherman Act has been shown to be violated. The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred. A plaintiff must prove the defendants illegally conspired. *See Todorov,* 921 F.2d at 1456; *cf. Monsanto,* 465 U.S. at 763–64, 104 S.Ct. at 1470–71. As stated before, this means that a plaintiff—to withstand defendants' summary judgment motion—must present evidence that casts doubt on inferences of independent (not combined) action or proper conduct by defendants. *See Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356–57. The plaintiff's evidence must prove the actors had an intent to adhere to an agreement that was designed to achieve an unlawful objective; it is not required that the proof show the actors specifically intended to restrain trade. *See Bolt,* 891 F.2d at 819–20.

■ Capital has made such a showing. It has presented circumstantial evidence that Mohawk Valley excluded it from the practice association in order to insulate Mohawk Valley's member radiologists from increased competition. For example, Capital has shown that Mohawk Valley recruited primary care doctors—who, like Capital, were located in Latham—because they could attract new patients and bring increased referrals to Mohawk Valley medical specialists. By contrast, Mohawk Valley excluded Capital's referral practice because accepting it would only increase internal competition among its members for radiology referrals.

As further circumstantial evidence of an agreement to boycott Capital, appellant demonstrated that its application for admission was denied despite its offer to open an office within the Plan's service area and despite the New York State Department of Health's lack of objection to the inclusion of a medical purveyor located outside the HMO's service area. Again, Capital noted its application was denied by Mohawk Valley without adherence to its membership admission practices, which require pre-rejection notification and an opportunity for a hearing. Ignoring its own written standards in the case of Capital's application for membership strongly suggests the objection to that application based on appellant's geographic location may have been a sham.

This evidence—when viewed as it must be in a light most favorable to appellant—tends to prove "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473. Thus, the district court erred when it failed to find a § 1 contract, combination or conspiracy. It apparently feared that such a finding would create a danger that "all HMOs would be illegal as *per se* violations of the antitrust laws." *Capital II,* 791 F.Supp. at 963. This concern is misplaced, at least with respect to the finding of a horizontal conspiracy. Our view does not interfere with either an HMO's ability to enter into vertical agreements with doctors associations or with physicians' abilities to regulate membership in practice associations for medically supportable reasons. Concluding that conspiracy was sufficiently shown in the instant case, at least for purposes of escaping summary judgment, leads to the second question in antitrust analysis: whether the defendants' action constitutes an unreasonable restraint of trade.

### C. *Unreasonable Restraint of Trade*

Despite its determination that no antitrust conspiracy existed, the district court undertook an assessment of the alleged restraint under the rule of reason. *See Capital II,* 791 F.Supp. at 964. Capital does not contend on appeal that the district court erred in utilizing the rule of reason instead of the rule of *per se* illegality. It apparently recognizes that such an argument would be futile given not only the Supreme Court's caution about extension of the *per se* doctrine into new areas, see *Indiana Fed'n of Dentists,* 476 U.S. at 458–59, 106 S.Ct. at 2017–18 but also the recognized procompetitive virtues of independent practice association forms of HMOs. Rather, appellant argues the district court's inquiry was fatally flawed because it viewed the relevant restraint as being vertical in nature. This misapprehension, accord-

ing to Capital, led the court to focus too narrowly on the appellees' market power and ignore the other necessary elements of a rule of reason inquiry into horizontal restraints.

■ The precise role that market power plays in rule of reason analysis of horizontal combinations or conspiracies is a matter of some dispute. Some courts and commentators have argued for a "safe harbor" approach. Thomas M. Jorde & David J. Teece, *Rule of Reason Analysis of Horizontal Agreements: Agreements Designed to Advance Innovation and Commercialize Technology,* 61 Antitrust L.J. 579, 606 (1993). Under this concept, unless an antitrust plaintiff makes a threshold demonstration that the defendants possess significant market power, the defendants' cooperative effort is immune from further rule of reason inquiry. *See Polk Bros. v. Forest City Enters.,* 776 F.2d 185, 191 (7th Cir.1985). *Compare Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 229 (D.C.Cir.1986) (Bork, J.) (employing safe harbor analysis), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987) *with id.* at 230 (Wald, J. concurring) (criticizing this method and arguing that reliance on market power alone is inappropriate).

The Supreme Court has never explicitly endorsed such a preclusive threshold approach. *See Indiana Fed'n of Dentists,* 476 U.S. at 460, 106 S.Ct. at 2018–19; *National Collegiate Athletic Assoc. v. Board of Regents of the Univ. of Okla.,* 468 U.S. 85, 108–09, 104 S.Ct. 2948, 2964, 82 L.Ed.2d 70 (1984). Nor have we embraced the view that market power is the *sine qua non* of antitrust liability. *See North American Soccer League v. National Football League,* 670 F.2d 1249, 1259–60 (2d Cir.) (market power not mentioned as threshold factor), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); *see also State of N.Y. v. Anheuser–Busch, Inc.,* 673 F.Supp. 664, 667–68 (E.D.N.Y.1987) (assessing, in a vertical restraint case, this Court's view of the role of market power). Still, we recognize that in most cases where horizontal restraints on competition are alleged, market power remains a highly relevant factor in rule of reason analysis because market power bears

a particularly strong relationship to a party's ability to injure competition. *Cf. Cox Broadcasting Corp.,* 730 F.2d at 69–70.

■ Rule of reason analysis requires the antitrust plaintiff to bear the initial burden of demonstrating that the defendants' conduct or policy has had a substantially harmful effect on competition. The plaintiff may satisfy this burden without "detailed market analysis" by offering " 'proof of actual detrimental effects, such as a reduction of output.' " *Indiana Fed'n of Dentists,* 476 U.S. at 460–61, 106 S.Ct. at 2019 (quoting Areeda, *supra,* ¶ 1511, at 429). Yet, where the plaintiff is unable to demonstrate such actual effects, it must at least establish that defendants possess the requisite market power so that their "arrangement has the potential for genuine adverse effects on competition." *Id.* Market power in that way serves as a " 'surrogate for detrimental effects,' " *id.* (quoting Areeda, *supra,* ¶ 1511, at 429), because

> [f]irms lacking substantial market power act against their own self-interest when they raise prices, reduce output, or otherwise restrain trade. The marketplace itself will discipline such misguided efforts as buyers switch to substitutes or new sources of supply enter the market. When market power is lacking, antitrust litigation is not needed to police restraints and maintain competition....

Jorde & Teece, *supra,* at 602–03.

■ In the case at hand, Capital believes its exclusion from Mohawk Valley has had actual detrimental effects: an increase in prices for and a deterioration of the quality of radiological services to Plan enrollees. But, Capital concedes in its brief that whether or not it is admitted into the physicians' association, the fee for radiological services would remain the same. In addition, Capital failed to adduce significant evidence that its exclusion has, in fact, resulted in any decrease in the quality of radiology services to the HMO's patients. Therefore, Capital has not made an adequate showing of detrimental effects to obviate the need to show that appellees possess market power sufficient to stifle competition.

Thus, turning to the question of market power, we agree with the district court that Capital has failed to demonstrate that a genuine issue of material fact exists with respect to appellees' strength in the marketplace. Capital defined the relevant geographic market as that area lying within a 100–mile radius of Albany, New York, and it defined the product market as the market for radiological services. *See Capital II,* 791 F.Supp. at 965. Appellees have accepted these market boundaries and have presented proof that within this 100–mile radius, the Plan's 100,-500 enrollees represent only 2.3 percent of the region's HMO subscribers and Mohawk Valley's membership includes only 6.75 percent of the region's physicians. Once competition from non-HMO sources within the 100 mile radius is included, the appellees' market share drops even further to merely 1.15 percent of the total insured patient population. Capital has not contravened the *accuracy* of these figures. Consequently, it is clear that with such a *de minimis* market share, appellees lack the power to injure competition or force consumers to accept supracompetitive health care premiums or lower quality medical care.

Capital objects that reliance on these statistics is improper because Mohawk Valley competes in the market for radiology referrals and not in the health insurance market, within which the Plan competes. We disagree. The radiology referrals controlled by the appellees are those referrals emanating from the HMO's enrollees and, therefore, focusing on the HMO's share of the consumer population is appropriate. Appellant next attempts to have us consider a new smaller geographic market within the 100–mile radius of Albany. This new market definition was not presented to the trial court and comes too late for our consideration. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). Moreover, even if we were to accept appellant's attempted new market definition, Capital's cause of action still would not withstand summary judgment because it has presented us with no claim—either in its briefs or after repeated inquiries at oral argument—that it would be able to present reliable data indicating what share of this new smaller market appellees control.

Finally, appellant points out that appellees have not put forward any pro-competitive justifications for their conduct. This argument is unavailing. Such justifications are unnecessary where Capital, as the plaintiff in this case, has not carried its own initial burden of showing a restraint on competition. *See Bhan,* 929 F.2d at 1413. Only after a plaintiff has successfully met its initial burden under the rule of reason must an antitrust defendant offer evidence to exonerate its conduct.

In sum, Capital's position is simply that it has been harmed as an individual competitor. It has not shown that defendants' activities have had any adverse impact on price, quality, or output of medical services offered to consumers in the relevant market. In *Jefferson Parish,* 466 U.S. at 31, 104 S.Ct. at 1568 the Supreme Court rejected a rule of reason claim arising out the exclusion of an anesthesiologist from staff privileges at a hospital, stating that "[w]ithout a showing of actual adverse effect on competition, [a plaintiff] cannot make out a case under the antitrust laws...." *Id.* Because no such showing has been made in the instant case, appellant's claim must also fail.

### CONCLUSION

We have carefully considered all the other arguments raised by the parties and find they do not warrant further discussion because our opinion fully disposes of them. Accordingly, for the reasons stated the order of the district court granting summary judgment to the defendants-appellees is affirmed.