65 F.3d 310
 1995-2 Trade Cases P 71,119
 Radoslav MARIC, Plaintiff-Appellant,
v.
ST. AGNES HOSPITAL CORP.; Robert J. Stackpole; Robert J.
Stanley, Vincent Du Vigneaud, Jr., M.D.; Vincent Nicolais,
M.D.; Joel Greenspan, M.D.; Michael Panio, M.D.; Donald
N. Cohen, M.D.; Vito Marrerro, M.D.; Barney D. Newman,
M.D.; Adrienne Weiss-Harrison, M.D.; Elliot Moshman, M.D.;
Gerald Campana, M.D.; William Zarowitz, M.D.; Virginia
Pelligrino, Defendants-Appellees.
 No. 763, Docket 94-7569.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 20, 1995.
Decided Sept. 13, 1995.
 
 Steven M. Kramer, Steven M. Kramer & Associates, New York City, for plaintiff-appellant.
 Richard E. Donovan, Kelley Drye & Warren (Roy W. Breitenbach, of counsel), New York City, for defendants-appellees St. Agnes Hospital Corp., Robert J. Stackpole, Robert J. Stanley, Vincent du Vigneaud, Jr., M.D., Vincent Nicolais, M.D., Donald M. Cohen, M.D., Vito Marrero, M.D., and Virginia Pelligrino.
 Wayne M. Rubin, Rende, Ryan & Downes, New York City, for defendants-appellees Barney D. Newman, M.D., Adrienne Weiss-Harrison, M.D., Elliot Moshman, M.D., Gerald Campana, M.D., and William Zarowitz, M.D.
 Before: WALKER, LEVAL, and CALABRESI, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 Plaintiff Dr. Radoslav Maric, a licensed obstetrician and gynecologist, filed this suit alleging, among other claims, that defendants conspired to deny him hospital privileges in order to prevent him from opening a birthing center that would compete with their practices. He contended that this conduct constituted a violation of the antitrust laws, namely the Sherman Act, 15 U.S.C. Sec. 1, and was thus actionable under the Clayton Act, 15 U.S.C. Secs. 15, 26. The United States District Court for the Southern District of New York (Charles L. Brieant, District Judge ) granted summary judgment in favor of defendants on the antitrust claim and dismissed the remaining state law claims without prejudice. We affirm.
 
 BACKGROUND
 
 2
 On July 1, 1989, Dr. Maric joined the Northeast Permanente Medical Group, P.C. ("NPMG"), a professional corporation that provides physician services to a health maintenance organization, Kaiser Foundation Health Plan of New York ("Kaiser"). As NPMG and Kaiser required, Maric soon after obtained staff privileges at St. Agnes Hospital ("St. Agnes").
 
 
 3
 After several months at St. Agnes, Dr. Maric told the President of St. Agnes, defendant Dr. Robert J. Stanley, that he wanted to open a birthing center that would feature a method of childbirth in which delivery occurred under water, an idea that he had entertained for the better part of ten years. According to Dr. Maric's complaint, Dr. Stanley promised his cooperation and signed a non-disclosure agreement on behalf of the hospital.
 
 
 4
 On November 26, 1989, Lori Cherry, a Kaiser subscriber, entered St. Agnes complaining of abdominal pain. She was five months pregnant. After Ms. Cherry lost consciousness, stopped breathing, and had no pulse, Dr. Maric and an internist were summoned. Dr. Maric arrived at the hospital at 11:30 p.m. and examined Ms. Cherry. By that time, she had spontaneously started breathing again and regained blood pressure but remained in a semicomatose state. Dr. Maric concluded that her condition was not related to her pregnancy and, after discussing the case with the internist, left the hospital at approximately 1:00 a.m. Unfortunately, Dr. Maric's conclusion was wrong. His patient died a few hours later from a ruptured ectopic tubal pregnancy.
 
 
 5
 As New York law required, the hospital reported Ms. Cherry's death to the New York State Department of Health ("DOH"), which initiated an investigation into the incident. In addition, the case was taken up at a number of meetings of various hospital committees at St. Agnes, including the Executive Committee, the Emergency Department, the Morbidity and Mortality Committee, the Medical Board, the Board of Trustees Quality Assurance Committee, and the Medical Peer Review Committee. On December 20, 1989, the Medical Peer Review Committee referred the matter to the Obstetrics and Gynecology Department, which held a peer review meeting on February 13, 1990. The Department concluded that Dr. Maric's management of the case was deficient principally because he failed to order certain tests, neglected to obtain a surgical consultation, and left the patient before a diagnosis was reached.
 
 
 6
 On March 22, 1990, Dr. du Vigneaud, the Director of the Department of Obstetrics and Gynecology and a defendant, presented the peer review's findings to the Board of Trustees Quality Assurance Committee. He recommended that Dr. Maric be informed that his cases would be monitored by the Obstetrics and Gynecology Department until further notice. The Quality Assurance Committee, concerned that these corrective measures might be inadequate in light of the seriousness of the case, ordered further review of the matter before recommending corrective action to the Board of Trustees.
 
 
 7
 In early April, 1990, while the foregoing review was underway, Dr. Maric informed Dr. du Vigneaud that he intended to purchase an existing obstetrics and gynecology practice to use as his birthing center. Under New York law, such a center must have procedures to transfer a patient to a hospital no more than twenty minutes away in case of complications. 10 NYCRR Sec. 754.2(e). New York law also requires the director of such a center to have either obstetrical privileges at the hospital or a formal agreement with the hospital for the provision of necessary care. 10 NYCRR Sec. 754.5(a)(1)-(2).
 
 
 8
 Meanwhile, following meetings on April 11 and 19 at which Ms. Cherry's death was discussed, the Quality Assurance Committee recommended that the hospital monitor Dr. Maric's and the internist's cases for a period of six months, and on April 24 the hospital sent Dr. Maric a letter to that effect. On May 4, less than two weeks later, another incident occurred that called plaintiff's professional judgment into question. A woman who was approximately twelve weeks pregnant was admitted to the hospital exhibiting signs of a possible miscarriage. Although both the duty nurse and the patient's husband called Dr. Maric repeatedly, he refused to come to the hospital. He claimed that he had been summoned by the woman earlier and had waited at the hospital for her but she had not shown up, and that in any event he was not needed.
 
 
 9
 On May 10, the State Department of Health cited St. Agnes for its treatment of Ms. Cherry. The deficiencies included Dr. Maric's failure to order certain tests and his decision to leave the hospital despite the patient's rapidly deteriorating condition. Faced with this assessment of the earlier incident and Dr. Maric's behavior on May 4, the Board of Trustees summarily suspended plaintiff's hospital privileges on May 17, 1990. NPMG then terminated him for failure to maintain staff privileges at St. Agnes.
 
 
 10
 Thereafter, Dr. Maric requested, pursuant to the hospital's by-laws, that an ad hoc committee be formed to review his suspension. The committee, comprised of Drs. du Vigneaud, Donald Cohen, and Michael Panio--all defendants in this action--interviewed Dr. Maric and examined the facts of the case before reaching an independent conclusion that summary suspension was appropriate. Dr. Maric then asked for and was given permission to present his case at an upcoming Medical Board meeting. The Board, after hearing Dr. Maric, recommended that the suspension be rescinded and that he instead be put on probation for one year, conduct all work under strict supervision, and receive a letter of reprimand. The Board of Trustees accepted this recommendation.
 
 
 11
 Dr. Maric filed suit in December of 1993. He alleged that the restrictions placed on him by the hospital forced him to abandon his plans for a birthing center, and that the hospital, its administrators, and the various doctors serving in its departments and on its committees had conspired to restrict his staff privileges, thus constituting a group boycott in violation of the Sherman Act and actionable under the Clayton Act. He also pressed a state law claim for intentional interference with contract and prospective contractual relations. On May 11, 1994, the district court granted the defendants summary judgment on plaintiff's antitrust claims and dismissed the state law claim without prejudice. Plaintiff appeals.
 
 DISCUSSION
 
 12
 As the foregoing recitation of facts makes clear, the hospital, faced with what was at the least questionable conduct on the part of Dr. Maric, followed a course of action that was reasoned, responsible, and attentive not only to its own interests but also to those of the public and Dr. Maric. Perhaps due to poor advice of counsel or an inability to perceive that his personal ambitions must at times yield to the hospital's interest in the health and safety of its patients, Dr. Maric has chosen to respond with a baseless antitrust claim that only serves to deplete the resources of the defendants and the courts. The district court correctly concluded that this antitrust claim cannot survive summary judgment.
 
 I. The Antitrust Claim
 
 13
 The first count of Maric's complaint asserts a claim under the Clayton Act. Under Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15(a), a plaintiff "who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may recover treble damages. In order to defeat a motion for summary judgment, Dr. Maric must create a genuine issue of material fact that (1) defendants violated the antitrust laws and (2) the violation caused him actual injury. See New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1076 (2d Cir.) (citing J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981)), cert. denied, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988). Dr. Maric has failed to demonstrate a genuine issue of material fact as to the violation of the antitrust laws.
 
 
 14
 The antitrust violation that Dr. Maric alleges is that defendants violated Sec. 1 of the Sherman Act. Under Sec. 1, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. Sec. 1. In order to establish a claim under Sec. 1, a plaintiff must therefore show (1) a contract, combination, or conspiracy; (2) in restraint of trade; (3) affecting interstate commerce. See Capital Imaging Assocs. v. Mohawk Valley Medical Assocs., 996 F.2d 537, 542 (2d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Plaintiff has failed to meet the first of these requirements.
 
 
 15
 The district court, drawing on Capital Imaging, concluded that, as employees of St. Agnes, the staff doctors and administrators did not have the legal capacity to conspire under the Sherman Act. The Capital Imaging decision, in holding that member physicians of an independent practice association are legally capable of conspiring with each other, noted that "the doctors are not staff physicians employed by the HMO on a salaried basis, that is, they are not agents of the HMO." 996 F.2d at 544. While this passage could be read to suggest, as the district court held, that staff physicians who are agents of an organization like an HMO or a hospital cannot conspire with the HMO or each other for antitrust purposes, we have not explicitly decided this issue.
 
 
 16
 We need not decide whether the individual defendants in this case, at least some of whom presumably are full-time staff physicians at the hospital, have the legal capacity to conspire together or with the hospital under Sec. 1 of the Sherman Act. It is abundantly clear to us that, even assuming the legal capacity to conspire, no conspiracy has been shown.
 
 
 17
 In Capital Imaging, we described the plaintiff's burden at the summary judgment stage to show an antitrust conspiracy:
 
 
 18
 The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred. A plaintiff must prove the defendants illegally conspired.... [T]his means that a plaintiff--to withstand defendants' summary judgment motion--must present evidence that casts doubt on inferences of independent (not combined) action or proper conduct by defendants.
 
 
 19
 996 F.2d at 545; see also International Distribution Ctrs. v. Walsh Trucking Co., 812 F.2d 786, 793 (2d Cir.) ("At a minimum, ... the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." (internal quotations omitted)), cert. denied, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); Brenner v. World Boxing Council, 675 F.2d 445, 451 (2d Cir.), cert. denied, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982).
 
 
 20
 We do not have the slightest doubt that defendants acted properly when they decided to limit Dr. Maric's staff privileges. Several different committees and departments within the hospital investigated and reviewed the circumstances leading to Lori Cherry's death, and all of the evidence points inexorably to the conclusion that the various staff members charged with scrutinizing plaintiff's behavior did so with care and reasoned deliberation. There is no credible dispute that this lengthy review process yielded serious, legitimate concerns as to plaintiff's conduct. The hospital's ultimate decision to allow Dr. Maric to maintain his staff privileges under supervision instead of suspending or revoking them, under these circumstances, was generous towards the plaintiff. Without further evidence of action on the part of defendants that suggests "commitment to a common end" other than their professed goal of maintaining the standards of medical care at the hospital, the sole fact that some of the defendants may in the future have faced some competition from Dr. Maric's hypothetical birthing center is insufficient to create a genuine issue of material fact as to the existence of a conspiracy to restrain trade. See Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir.), cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).
 
 
 21
 While this case might well be a candidate for sanctions in light of the baseless nature of plaintiff's antitrust claim and the waste of resources that it has generated, because the issue of sanctions has not been raised, we will confine ourselves to affirming the district court's dismissal. Accordingly, we hold that the district court correctly granted summary judgment to defendants on plaintiff's antitrust claim.
 
 II. Remaining State Law Claims
 
 22
 After dismissing Maric's antitrust claim, the district court then dismissed the remaining state law claims without prejudice. Although a district court retains the discretion to exercise pendant jurisdiction and entertain state law claims once all federal claims have been dismissed, see Enercomp, Inc. v. McCorhill Publishing, 873 F.2d 536, 545 (2d Cir.1989), generally "if the federal claims are dismissed before trial, ... the state claims should be dismissed as well," United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); see Girard v. 94th St. & Fifth Ave. Corp., 530 F.2d 66, 72 (2d Cir.), cert. denied, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976). We are unable to fault the district court in doing so here.
 
 CONCLUSION
 
 23
 For the reasons stated above, we affirm the judgment of the district court.