ROME AMBULATORY SURGICAL
CENTER, LLC, Plaintiff,

v.

ROME MEMORIAL HOSPITAL, INC.,
and Greater Rome Affiliates, Inc.,
Defendants.

No. 5:01–CV–23.

United States District Court,
N.D. New York.

Dec. 22, 2004.

Epstein, Becker & Green, P.C., William G. Kopit, Michael R. Bisegger, of Counsel, Washington, D.C., Attorneys for Plaintiff.

Wood & Smith, P.C., William J. Leberman, of Counsel, Syracuse, NY, Attorneys for Plaintiff.

Hancock & Estabrook, LLP, Thomas C. Buckel, of Counsel, Syracuse, NY, Attorneys for Defendants.

HURD, District Judge.

*TABLE OF CONTENTS*

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 396

II. *BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

III. *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402
 A. *Summary Judgment Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402
 B. *Standing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403
 1. Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403
 2. Antitrust Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 404
 C. *Sherman Act Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406
 1. *§ 1 Sherman Act Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406
 a. Tying Claims (*First* and *Second* Causes of Action) . . . . . . . . . . . . . . . . . 407
 b. Illegal Exclusive Contract (*Third* Cause of Action) . . . . . . . . . . . . . . . . 409
 (1) Anticompetitive Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 409

 (2) Unreasonable Restraint ................................... 410
 (3) Procompetitive Justification .............................. 410
 c. Market Allocation (*Fourth* Cause of Action) ...................... 411
 d. Conspiracy to Restrain Trade (*Fifth* Cause of Action) .............. 411
 e. Per se Illegal Boycott (*Sixth* Cause of Action) ................... 413
 2. *§ 2 Sherman Act Claims* ....................................... 414
 a. Monopoly Leveraging and Monopolization of the Outpatient
 Surgery Market (*Seventh* and *Ninth* Causes of Action) ........... 414
 b. Attempted Monopolization of the Outpatient Surgery Market
 (*Eighth* Cause of Action) ................................... 416
 (1) Predatory or Anticompetitive Conduct ...................... 416
 (2) Intent to Monopolize ...................................... 417
 (3) Dangerous Probability of Achieving Market Power............. 417
 c. Conspiracy to Monopolize the Outpatient Surgery Market
 (*Tenth* Cause of Action) ................................... 420
 D. *State Law Claims* ............................................ 422
 1. Intentional Interference with Contractual Relations (*Eleventh* Cause
 of Action) ................................................ 422
 2. Interference with Business Relations (*Twelfth* Cause of Action) .......... 422

IV. *CONCLUSION* ................................................. 424

ABBREVIATIONS USED THROUGHOUT

| | | |
|---|---|---|
| BCBS | – | BlueCross BlueShield of Utica–Watertown |
| CNYMA | – | Cental New York Medical Alliance, PLLC |
| CoN | – | Certificate of Need |
| GRA | – | defendant Greater Rome Affiliates, Inc. |
| MVP | – | MVP Health Plan, Inc. |
| PHO | – | physician hospital organization |
| RAPO | – | Rome Area Physicians Group |
| RASC | – | plaintiff Rome Ambulatory Surgery Center, LLC |
| RMG | – | Rome Medical Group, P.C. |

## PROTECTIVE ORDER

On October 24, 2002, United States Magistrate Judge Gustave J. Bianco issued a Revised Protective Order in this case. In the spring of 2004, during the course of filing summary judgment papers, the parties agreed between themselves to file all submissions conventionally, and under the protective seal, to prevent the inadvertent disclosure of sensitive information. As such, the documents in support of the motions decided below are not available at this time.

Plaintiff has moved to lift the seal on large portions of the material. Defendants oppose in part. These motions are scheduled to be heard on January 14, 2005 in Utica, New York. To the extent that information contained within the sealed record is revealed in the course of this decision, the seal is lifted. Due consideration has been given to the information revealed and it has been determined that such information is not in conflict with the purposes for which the order was granted.

## MEMORANDUM–DECISION and ORDER

### I. INTRODUCTION

Plaintiff Rome Ambulatory Surgery Center, LLC ("plaintiff" or "RASC") brought suit against Rome Memorial Hospital, Inc. ("defendant", "Rome Hospital" or the "Hospital") and its corporate parent Greater Affiliates, Inc. ("GRA" or "defendants").

Plaintiff was a freestanding ambulatory surgical facility located in the City of

Rome, New York within Oneida County.[1] Prior to the events which led to this action, the Rome medical community was politically divided. A significant number of area physicians were affiliated with the Hospital, and another group of independent physicians had formed their own organization. The plaintiff facility was established by the non-hospital, independent physicians, and the alleged illegal conduct consists of Hospital efforts aimed at harming the competing facility.

Defendants' alleged conduct falls into two general categories. First, plaintiff alleges that defendants engaged in various acts to limit the number of patient referrals to RASC. This included inducing and conspiring with the affiliated physicians such that those physicians would not refer patients to RASC for surgery, and intimidation of the physicians who used the facility. The second category of alleged illegal conduct involves entering into unlawful exclusive contracts with commercial third party payers. Under these contracts, the patients covered by those health insurance plans were effectively removed from the market in which RASC competed.

RASC claims that this referral restriction and exclusive contracting, not only injured plaintiff, but forced it to leave the market taking with it the consumer benefits it provided; greater customer choice, higher quality service, and lower prices.

Plaintiff's second amended complaint asserts twelve causes of action. There are six causes of action under Sherman Act 15 U.S.C. § 1:

*First* Cause of Action—Tying Contract in Restraint of Trade;

*Second* Cause of Action—Per se Illegal Tying Contract;

*Third* Cause of Action—Illegal Exclusive Contracts;

*Fourth* Cause of Action—Market Allocation;

*Fifth* Cause of Action—Conspiracy to Unreasonably Restrain Trade in Out-Patient Surgery, and;

*Sixth* Cause of Action—Per se Illegal Boycott.

There are four causes of action under Sherman Act 15 U.S.C. § 2:

*Seventh* Cause of Action—Monopoly leveraging;

*Eighth* Cause of Action—Attempted Monopolization;

*Ninth* Cause of Action—Monopolization of the Outpatient Surgery Market, and;

*Tenth* Cause of Action—Conspiracy to Monopolize the Outpatient Surgery Market.

Finally, there are two causes of action brought pursuant to New York State law;

*Eleventh* Cause of Action—Intentional Interference with Contractual Relations, and;

*Twelfth* Cause of Action—Interference with Business Relations.

Pursuant to Fed.R.Civ.P. 56, defendants moved for summary judgment on the entire complaint, based on lack of standing—causation and failure to demonstrate an antitrust injury—and various insufficiencies of the separate causes of action. Plaintiff cross-moved for summary judgment on the *Fifth* and *Tenth* conspiracy causes of action. Oral argument was heard on August 13, 2004 in Utica, New York. Decision was reserved.

---

**1.** At the time of the 2000 U.S. Census, the City of Rome had a population of 34,950. U.S. Census Bureau, http://factfinder.census.gov.

## II. BACKGROUND

Most of the following facts are not in dispute. The interpretation of the facts is, of course, in sharp dispute. Where there are factual conflicts, pursuant to the summary judgment standards (see *infra* p. 402), the facts are viewed most favorably to the plaintiff, except as to the two causes of action where it is the movant.

Rome Hospital is a not-for-profit community hospital that provides a full range of patient services including general inpatient acute care and outpatient surgery. It is affiliated with other non-profit and for-profit corporations which provide support to the Hospital and various medical services in the Rome area. While it is the only hospital within the City of Rome, there are four others within a twenty mile radius; Oneida Healthcare, St. Elizabeth Medical Center, Faxton Hospital, and St. Luke's Healthcare. The last two are owned by Mohawk Valley Network which also owns several outpatient facilities in Rome.

There were three significant changes in the Rome healthcare environment in the years immediately preceding the events which led to this action. The first was in 1995 wherein the Hospital transformed from a heavily-indebted publicly-managed hospital to a non-profit private hospital. Following the change in status, the Hospital began another reconfiguration into a managed care system/network. The financial plan of the Hospital presumes that profits from ambulatory surgeries will be used to subsidize other, less profitable, medical services.

The next year brought a change in the regulatory environment, The Healthcare Reform Act of 1996, effective January 1997, replaced Department of Health regulation of hospital rates for most third party payers with a competitive system. Prior to the Reform Act the state set hospital reimbursement rates under a formula which guaranteed higher rates each year. Rome Hospital now had to negotiate for rate changes, both upward and downward. The two largest health insurers in Oneida County throughout the 1990s, measured in terms of patients insured, were Blue Cross/Blue Shield ("BCBS") which covered about 21% of the people who used Rome Hospital, and MVP Health Plan ("MVP"), which covered approximately 8 to 9% of the Hospital's patients.[2] The third party payers used the area's market competitors against each other in negotiating rate reductions, and to pressure area hospitals to deal with market actors the payers could not otherwise reach, i.e. the area's anesthesiologists.

Also during this time, the national boom in free-standing ambulatory surgical centers reached upstate New York. Ambulatory or out-patient surgery is surgery for which the recovery period is less than twenty-four hours and the required post-operative care is not intensive.

RASC claims that the Hospital's change in corporate form contributed to a devise in the local medical community. The change allowed for meetings to be conducted in private, as opposed to previous practice, and for new contractual arrangements with physicians, which weren't entered into evenly across the staff. Regardless of the stimulus, two distinct, and apparently rival, physician groups were formed in Rome, Central New York Medical Alliance PLLC ("CNYMA") and Rome Area Physicians Group ("RAPO"). One example of the alleged conflict between the groups

---

2. BCBS figure for 1999 from the Dennison Declaration. (Docket No. 121, p 12.) MVP figure is undisputed by the parties at Plaintiff Opposition to Defendants Statement of Material Facts at ¶ 85.

consisted of some CNYMA physicians refusing to work hospital call-schedules with non-CNYMA members.

In 1996, Rome Hospital and certain physicians initiated two physician hospital organizations ("PHOs"). The first was CNYMA, which included Rome Medical Group ("RMG"), the largest primary care practice in the Rome area, and other primary care and specialty physicians. CNYMA negotiated manage care contracts for the physicians. The second PHO was Physician Support Services IPA, Inc. which provided billing and record keeping services to its members.

Because RASC alleges a conspiracy between Rome Hospital and area "cooperating physicians," facts concerning the relationship between them must be related. Among other things, CNYMA was a referral group. Where RMG made an average of 163 referrals per physician to CNYMA physicians, it made an average of 24 referrals to non-CNYMA/non-RMG physicians. The Hospital and CNYMA were financially involved, in large part, because the Hospital relied on CNYMA doctors to refer patients to the hospital. The physicians benefitted from the alliance through arrangements like the Hospital's purchase of RMG's in-office laboratory business. After the purchase, the Hospital continued to pay RMG rent for the laboratory space because it is located on the medical group's premises. Another benefit included income supplements provided by the Hospital for use in recruiting RMG physicians.

Dr. Jeffery Amidon, a RMG partner who spent most of his time at the Hospital, kept the medical group informed about RMG's interaction with the Hospital, specifically its doctors' referral patterns, in order to maintain a strong, tight service network. RMG documents in the record reveal that it kept track of the referrals and that someone at RMG would discuss referral decisions with those doctors who deviated from recommended practice. (Docket No.116, Ex. 79 –84). Prior to RASC's opening, the Hospital tracked physician affiliation with CNYMA and RAPO and use of its surgical facilities. (Docket No.137, Ex. 57)

The same month RASC opened, St. Elizabeth Hospital issued a Letter of Intent to buy RMG. The Hospital subsequently purchased an option to consider its own purchase of the medical group, conducted due diligence and decided to buy the practice. While the Hospital would lose money on the purchase, it was determined that it would lose more by letting the practice, and thus the referrals, go to St. Elizabeth's. The sale was completed six months after RASC's closure.

The other area physician group, RAPO, was also formed in 1996. The group consisted of Rome area primary care physicians and doctors in every specialty. RASC was developed by the non-hospital affiliated physicians, though they maintained Hospital privileges and worked as Hospital staff. Many, but not all, of the doctors who own stock in RASC were RAPO doctors.[3] The physicians felt they could recapture ambulatory service patients who left the area for service, at least in part due to dissatisfaction with Rome Hospital. RAPO members also tend to refer within their physician group. Indeed, RASC's business plan relied heavily on RAPO physician use of the facility.

---

**3.** At least some of the independent physician RASC investors are also involved in another competing enterprise, Mohawk Valley Network, which competes in Rome in the area of radiation oncology, out patient physical and occupational therapy, dialysis, and mobile mammography.

In December of 1996, RASC filed a Certificate of Need ("CoN") application with New York State Department of Health seeking approval for its proposed ambulatory surgical facility. The Hospital predicted an estimated 2.4 Million Dollar loss to Hospital if RASC opened and met its projected numbers. The Hospital, and others (St. Elizabeth's, Faxton Memorial Hospital, St. Luke's Healthcare, and Auburn Memorial), opposed the application through the regulatory process.

The Hospital's Director of Managed Care, Mr. Paul Tasillo, was the Hospital employee responsible for dealing with the CNYMA physicians. He coordinated a letter writing campaign in opposition to RASC's CoN. He sent the CNYMA physicians a sample opposition letter, collected their responses, and reported the results to the Hospital. He later requested letters in support of the Hospital's own CoN to refurbish its ambulatory surgery facilities.

However, there was support for RASC's application to open its facility from the third party payers or the commercial insurance companies. Both MVP and BCBS stated that they intended to contract with RASC.

RASC's pending entry into the market effected contract negotiations between Hospital and the commercial payers. MVP and BCBS admitted that they needed Hospital business to do business in Rome. Yet, for the first time they had a direct competitor to use to effect a more favorable deal in ambulatory surgery. In January of 1999, the Hospital and BCBS engaged in negotiations over potential discounted outpatient surgery rates in exchange for an exclusivity designation. Late in the month however, BCBS abruptly stopped the negotiations citing political considerations. Initially, and at the time of these negotiations, BCBS policy in dealing with ambulatory surgery centers was to automatically contract with new facilities. Accordingly, BCBS entered into a contract with RASC. This contract was to expire on December 31, 2000.

The Hospital was, however, able to obtain an exclusivity provision in its contract with MVP. The history of negotiations between those parties was a little different. In the summer of 1997, MVP signed an exclusive contract with another provider, Centrex, for laboratory services. All MVP-covered patients had to have their lab work done at Centrex. Various efforts by RMG doctors and Hospital effected an exception to the agreement which allowed for some lab work to be done through the Hospital.

Considering MVP's exclusive agreement with Centrex, Hospital claims it feared another MVP exclusive, this time with RASC, and so sought one itself beginning in January 1999. MVP agreed to an exclusive designation for ambulatory surgery with Hospital for three years, January 1, 1999 through December 31, 2001, and received reduced rates for ambulatory surgery from the Hospital. The agreement included a ninety-day termination clause. This agreement effected RASC usage because third party payers effectively exercise patient choice since patients must often pay out-of-pocket for uncovered procedures.

In January 1998, the Hospital also had a CoN application with the state seeking permission to improve and expand its own ambulatory surgery facility. New York State Department of Health granted both facilities' CoNs. The Hospital subsequently withdrew its application in July of 1998 because of costs, and declined to improve its ambulatory facilities to provide more direct competition to RASC.

In June 1999, RASC opened in leased space on the former Griffiss Air Force Base in Rome and operated for eighteen months until January 2001.

Submitted testimonials relate RASC patients' satisfaction with the new facility. By RASC's account it was more convenient, patient friendly, and cost effective than the Hospital. However, plaintiff never met its costs. While the reasons are disputed, it is clear that RASC costs were higher than projected, and its income was lower. For one, RASC did a higher percentage of government paid surgery than expected, and this, in turn, meant a lower average pay rate than expected.

RASC's allegations focus on its lower than expected income due to low patient use of RASC as a result of defendants' conduct. Plaintiff alleges that low referral rates were due to Hospital's intimidation of its users, and conspiring with cooperating physicians to choke off referrals. Referral practices affected RASC usage because patients generally follow doctor recommendations.

RASC solicited 144 physicians from Rome, Oneida, Utica, and New Hartford. Forty-four applied, but only twenty-four actually used the facility, and half of those were RASC owners. This was in part because RASC investor physicians gave patients a choice of facilities. This was also in part due to the need to access emergency care if necessary, which meant using the Hospital's services. Scheduling and practicality also determined RASC use. Generally, referrals continued to flow according to the political divisions between CNYMA and RAPO. Overall, even physicians that used RASC used the Hospital more often than they used RASC.[4]

As noted, non-hospital affiliated RASC physicians maintained Hospital privileges and worked as Hospital staff. This meant that RASC investor physicians were in a position to refer Hospital patients to their own facility. It would be possible for them to refer those patients who required profitable procedures to RASC, and leave the costly ones for the Hospital. Whether or not this occurred is disputed by the parties and their experts.

The Hospital experienced a 14.7% decline in out-patient cases in the first six months of RASC operation, and an estimated loss of 18 to 20% of its cases over the full eighteen months. Due to One Million Dollars in cost reductions in the year 2000, overall Hospital profits increased during RASC's tenure, but the Hospital lost money on ambulatory surgery while RASC operated.

The month RASC opened, the Hospital's Board of Trustees amended its bylaws to allow the Board to consider whether a physician competes with the hospital in evaluating medial staff appointments. The bylaw was never used and was removed in 2002 (after RASC closed).

Plaintiff further alleges that the Hospital and/or its co-conspirators harassed the physicians that supported RASC; one doctor received an unfavorable review, one suffered public accusations of disloyalty to the Hospital and was reported to the Department of Health, two lost contracts with the Hospital, two suffered extra competition from doctors that the Hospital recruited to the area, and one happened to be reported for an immigration violation. (Docket No. 137, Ex. 57).

Meanwhile the negotiations between BCBS and the Hospital concerning ambulatory surgery intensified. Having declined to enter into an exclusive contract in with the Hospital in 1998, BCBS proceeded to use the Hospital's interest in ambula-

4. All but two of the RASC investors used the Hospital more than RASC.

tory surgery to its advantage. In 1999, BCBS had a specific negotiation plan wherein it threatened to remove Rome Hospital as a provider unless it lowered its ambulatory rates and pressured its independent anesthesiologists to become participating providers with BCBS. BCBS used the same steerage threat against the Utica hospitals. The threat was to steer patients to another facility if each hospital didn't bring the local anesthesiologists into the BCBS network. The Hospital continued to try to bargain for exclusivity, or at least a no steerage provision.

The sequence of events during the 2000 negotiations is disputed, but at some point RASC asked BCBS for a 25% rate increase in the next contract, and BCBS received what it considered to be an unfavorable report concerning RASC's financial status and plans. BCBS noted that one of RASC's problems was that it simply was not getting the expected patient flow. (Docket No. 120, Ex. 4 Bozer Dep.) In November 2000, BCBS entered into a two-year contract (2001 and 2002) with the Hospital which gave the Hospital an exclusive in ambulatory surgery. Therefore, the contract between RASC and BCBS which expired on December 31, 2000, was not extended or renewed. BCBS constituted an estimated 25 to 30% of RASC business. Plaintiff claims that the Hospital's exclusive contract with BCBS was the final straw that put it out of business.

Less than a month later, in January 2001, RASC closed.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

"By avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces, summary judgment serves a vital function in the area of antitrust law." *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142

F.3d 90, 95 (2d Cir.1998) (citations omitted). Yet, "[t]he standard for summary judgment applies equally to antitrust cases as to any other case." *United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 742 (2d Cir.1989) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 477 U.S. 242 (1986).

Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. at 1356; *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. To withstand

a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356.

### B. *Standing*

Defendants have raised the threshold question of whether or not plaintiff has met the standing requirements for bringing suit. Plaintiff filed pursuant to § 4 of the Clayton Act which provides standing to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. The issues raised here are not clearly related under this language, but really just take the form of traditional constitutional standing requirements of causation in fact and confirmation that the injury falls within the target area of the antitrust laws, now examined under the antitrust injury doctrine articulated in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).[5] *See Primetime 24 Joint Venture v. NBC*, 219 F.3d 92 (2d Cir.2000). These will be addressed in turn.

### 1. *Causation*

▇▇▇ "Lack of causation in fact is fatal to any antitrust claim." *Argus Incorporated and Interphoto Corporation v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986). The defendants argue that RASC was a losing venture that failed of its own accord due to factors independent of any defendant conduct; that is to say, defendants did not cause RASC's failure. It is first noted that a defendant does not have to cause complete business failure for a finding of antitrust liability, under the plain language of the statute, an injury will suffice.

At summary judgment, plaintiff only needs to set forth sufficient facts to allow a reasonable fact finder the inference that defendants were a substantial factor in causing injury. *Irvin Industries, Inc. v. Goodyear Aerospace Corporation*, 974 F.2d 241, 246 (2d Cir.1992); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969) (the illegality must be shown to be a material cause of the injury.) In reality an injury is rarely the result of a single cause, and thus courts have addressed the relationship between multiple causes deciding that "[a] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith Radio Corp.*, 395 U.S. at 114, 89 S.Ct. at 1572. But, where other factors overwhelm the factor(s) defendant allegedly contributed to summary judgment is appropriate. *See Greater Rockford Energy and Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 402 (7th Cir.1993); *see also* Areeda, Antitrust Law, An Analysis of Principles and Their Application, Para. 338 (2002). The question here is whether in relation to other factors, the alleged Hospital conduct could reasonably be found to be a material cause of RASC's injury.

Defendants effectively demonstrate, and plaintiff does not dispute, that there were numerous factors independent of any defendant conduct that led to RASC's financial injuries and subsequent closure. RASC performed more lower paying work than projected; less higher paying work than projected, and more lower paying

---

5. The standing inquiry "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citations omitted); *Young v. Lehigh Corp.*, No. 80–C4376, 1989 WL 117960, (N.D.Ill. Sept.28, 1989).

Medicare/Medicaid work than projected. RASC investors also underestimated costs of their venture. Defendants have also presented testimony to the effect that perhaps the "work of the investors was unprofitable at any location." (Docket No. 125, Burns Dec. ¶ 85–86.)

Assuming, as plaintiff claims, that RASC's injury and/or failure was due to lower than expected patient use rates and the termination of RASC's BCBS contract, defendants have provided independent alternative causes for those factors as well. Some RASC investors testified that their lower than expected use of RASC was due to patient choice and convenience. All of the non-RASC physicians testified that patient choice, convenience, and medical considerations formed the basis of their referral decisions. Defendants offer testimony that RASC's BCBS contract may have been terminated, not due to the terms of the Hospital's contract with BCBS, but rather because BCBS thought RASC was a losing venture. There is also the fact that RASC asked BCBS for a 25% increase in rates for the next contract period.

Despite the evidence of alternative factors and alternative causes for those factors, plaintiff has set forth facts sufficient to support a reasonable inference that defendants were a material cause of injury to RASC. This inference might require accepting all of plaintiff's allegations as true and inferring a cumulative effect, but it is possible and would thereafter be reasonable. The lower than expected use rates and loss of the BCBS contract could be found to be material causes of RASC's injury, and plaintiff has set forth sufficient facts to allow an inference that defendants' conduct caused both circumstances.

In addition, plaintiff has alleged various adverse actions that Rome Hospital took against doctors supporting RASC and that the Hospital did not take any against non-RASC affiliated physicians. Such physicians might reasonably have felt threatened by the passing of the bylaw, despite the fact it was never used, considering that providers of medical services in the Rome area needed the hospital, and not necessarily RASC, to be successful. It was also well known that Rome Hospital felt financially threatened by RASC; and the Hospital opposed its opening and its continued operation. Under such circumstances, a reasonable fact finder could conclude that the physician intimidation and the alleged conspiracy between the Hospital and some area physicians would restrict referral to RASC causing injury.

Moreover, if the exclusive contract between BCBS and Rome Hospital is found to illegally restrain trade, there is a direct link to the injury of RASC as BCBS patients constituted approximately 29% of plaintiff's income. (Docket No. 115, Ex. 27 Alteri Dec.)

### 2. *Antitrust Injury*

■ A second aspect of standing in an antitrust case is the requirement that plaintiff's injury is an antitrust injury, as opposed to a competitive injury. *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) This requirement underscores the fundamental tenet that "the antitrust laws ... were enacted for 'the protection of competition, not competitors.'" *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 690, 50 L.Ed.2d 701 (1977) (*quoting Brown Shoe v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

■ Plaintiffs must demonstrate an antitrust injury, that is "an injury of the type the antitrust laws were intended to prevent," and that it flows from that which

makes defendants' acts unlawful.[6] *Balak-law*, 14 F.3d at 797. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697; *see R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.1989), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). In other words, defendants' conduct must injure competition and the plaintiff through the same mechanism.[7] This means an analysis of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Greater Rockford Energy*, 998 F.2d at 396 (*quoting Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983)).

The burden is met if the alleged conduct would prevent RASC from competing in the ambulatory surgery market, not just keep RASC from winning in it. Foreclosing competition on the merits is conduct the antitrust laws seek to prevent. In *Brunswick*, the seminal "antitrust injury" case, plaintiffs were injured by defendants' conduct but not by the reason of that which made the conduct unlawful. Defendant competitors bought plaintiffs' competition, and therefore prevented plaintiffs from profiting from the failure of the competitors. If injured, the *Brunswick* plaintiffs were not injured by reason of anti-

trust law violations, but by the increased competition.

█ RASC alleges that Rome Hospital captured ambulatory surgery patients due to improperly influencing physicians' referral decisions as opposed to capture by providing better facilities or service, thus the requirement is satisfied. The alleged conduct precludes competition on the merits.

Likewise, there is little doubt that RASC, as a direct competitor, was harmed by the exclusive contract between Rome Hospital and BCBS. If as RASC claims, BCBS terminated its contract with RASC as a result of an illegal exclusive agreement, as opposed to loss of the contract due to RASC's requested rate increase or financial insecurity, then the requirement is met. That is to say, if instead of continuing to compete for patients by simply lowering its rates or offering a better facility, the Hospital acted to foreclose competition altogether through improper exclusive dealing, then it engaged in conduct antitrust law intended to prevent. *See Doctor's Hosp. of Jefferson v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir.1997).

Plaintiff has set forth sufficient facts to allow a fact finder a reasonable inference that defendants were a material cause of RASC's injury and the injury flows from conduct antitrust laws seek to prevent.

---

6. For the purposes of analyzing standing at this early stage of litigation, the existence of the antitrust law violations has been assumed in order to examine the other standing elements. Antitrust Law Para. 335 is instructive. Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law An Analysis of Principles and Their Application (2002).

7. Defendants argue here that plaintiff cannot demonstrate an injury to competition or consumers. This argument is best addressed as against plaintiff's substantive Sherman Act

claims. *See Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 (3d Cir.1999) (finding error where the lower court "incorporat[ed] the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section 1 of the Sherman Act.... The court's approach may have been the result of the similar 'antitrust injury' label which is applied to the injury component of antitrust standing analysis and to the marketplace harm element under section 1.")

Defendants' motion for summary judgment on standing grounds must be denied.

## C. Sherman Act Claims

Defendants' alleged illegal conduct falls into two general categories; efforts to restrict referrals to RASC, and exclusive contracting with commercial payers. The different categories and their combinations form the basis of different claims and it is important to be clear exactly what plaintiff has alleged when considering each claim.[8] Section 1 of the Sherman Act forbids every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states. 15 U.S.C.S. § 1. Plaintiff has characterized the exclusive contracts under four theories of unlawful agreements; tying, illegal exclusive contracting, market allocation, and a group boycott. The exclusive contracts are also the basis of plaintiff's state law claims for tortious interference. Plaintiff characterizes the referral restricting conduct as a conspiracy, and brings conspiracy claims under both §§ 1 and 2 of the Sherman Act. Finally, the § 2 Sherman Act monopolization claim combines the conduct categories in an attempt to demonstrate anticompetitive or predatory conduct.

### 1. § I Sherman Act Claims (First through Sixth Causes of Action)

■ To establish a § 1 violation, a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or under the rule of reason. *See Tops Mkts.*, 142 F.3d at 95.

■ Determination of whether defendants' challenged conduct violates state and federal antitrust laws is guided by rule of reason analysis unless the conduct falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *New York v. St. Francis Hosp.*, 94 F.Supp.2d 399, 411 (S.D.N.Y.2000) (*citing Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)).

■ "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 1522–23, 99 L.Ed.2d 808 (1988). The restraints at issue here are between the Hospital and its customers, referring physicians, and commercial payers. These are vertical market relationships. Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to "rule of reason" analysis. *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 243 (2d Cir.1997) (citations omitted).

■ Under the rule of reason, before a fact finder may consider the harms and benefits of the challenged behavior, a plaintiff initially must show that the chal-

---

**8.** In its submissions plaintiff has taken a rather liberal or expansive view of the claims. Many times in its arguments it has intermingled the claims. The second amended complaint is plaintiff's third effort to articulate its position. Each cause of action shall be strictly construed in accordance with its particular claim.

lenged action had an actual adverse effect on competition as a whole in the relevant market. The fact that it may have been harmed as an individual competitor will not suffice. *Tops Mkts.,* 142 F.3d at 96.

▮ Plaintiff has two independent means by which to satisfy the adverse-effect requirement. The first option is to show an actual adverse effect on competition. *See F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 128 (2d Cir.1995); *Capital Imaging Assocs. v. Mohawk Valley Medical Assocs.,* 996 F.2d 537, 546 (2d Cir.1993); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386 F.3d 485 (2d Cir.2004).

▮ Alternatively, plaintiff can demonstrate an "adverse effect" indirectly by establishing that defendants had sufficient market power to cause an adverse effect on competition. *See K.M.B. Warehouse Distribs.,* 61 F.3d at 128–29; *Capital Imaging,* 996 F.2d at 546. But then a plaintiff must show more than just market power. In order to support an inference based on market share, an additional ground for believing that the defendants' conduct could harm competition is required, for example the nature of the conduct alleged or structure of the market at issue. *Tops Mkts.,* 142 F.3d at 97. A showing of market power requires definition of the market.

▮ If the plaintiffs satisfy these initial rule-of-reason burdens, anti-competitive effects and an unreasonable restraint of trade—the burden shifts to the defendants to offer evidence of the procompetitive effects of their agreement. *Moccio v. Cablevision Systems Corp.,* 208 F.Supp.2d 361, 379 (E.D.N.Y.2002). If defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any

legitimate competitive benefits offered by defendants could have been achieved through less restrictive means. *Id.* Ultimately, the fact finder must engage in a careful weighing of the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition.

a. *Tying Claims (First and Second Causes of Action)*

▮ A tying arrangement is the conditioning of the sale or lease of one item (the "tying" product) on the purchase of another item (the "tied" product). *Hack v. President & Fellows of Yale College,* 237 F.3d 81, 85 (2d Cir.2000). The essence of the claim is that the seller exploits his market power in the tying product to restrain competition in the market for the tied product. Plaintiff alleges that defendants required the third party payers, BCBS and MVP, to contract for outpatient surgery services on an exclusive basis as a condition for contracting for general inpatient acute care hospital services on a discounted basis. (Amended Complaint ¶ 147, 154).

▮ To state prima facie tying arrangement claim under the Sherman Act, plaintiff must allege: (1) two separate and distinct products, (2) actual coercion by seller that forces buyer to take tied product, (3) seller's market power in tying product or ability to force buyer to take tied product, (4) anticompetitive effects in tied product market, and (5) more than insubstantial amount of interstate commerce affected by tying arrangement in tied product market. *Moccio,* 208 F.Supp.2d at 375; *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12–18, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984); *Fortner Enters. v. United States*

*Steel Corp.*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969).

Plaintiff brings both per se and rule of reason tying claims. Leaving aside all the other elements of either type of tying claim, plaintiff cannot demonstrate that defendants actually coerced the third party payers into entering into exclusive contracts for ambulatory services. *See Hack*, 237 F.3d at 85. Nor has plaintiff set forth sufficient facts to support a reasonable inference of such coercion. On the contrary, the record effectively demonstrates that the exclusive contracts, unreasonably restrictive or not, were the product of negotiation.

Timothy Bozer of BCBS testified as to BCBS's posture at the time BCBS decided to grant the Hospital the exclusive contract in 2000.

> Q: The reality was Blue Cross, or Excellus at the time, was not giving up much by agreeing to the exclusivity in light of the past history and in light of what you saw of [RASC's] financial status?
>
> A: Until we saw [the] numbers and reports [RASC] showed us we just weren't going to sever ties on an integrity level. They're doing things. They weren't really monitored. We don't have a staff to monitor every account. That put it right in our face. That was a big turning point in my mind that changed everything. This clarified it for us.
>
> Q: You're giving up something that [the Hospital] wanted but in reality, you weren't giving up much?
>
> A: The doctors weren't going to be upset, because generally they weren't using the surgery center. The patients wouldn't notice... because they weren't using it very much either... The groups were fine with us before then, they would be fine with us after. We didn't see by the volume there would be much

ripple effect. We didn't want to sever a business relationship we established, and then someone gives you all the information you need to make a quick business decision and it's very compelling.

(Docket No. 120, Ex. 4, Bozer Dep. pp. 295–296).

Plaintiff's attempt to overcome this demonstration consists of pointing to BCBS testimony where it admits that a medical service provider selling in Rome needed the Hospital to do business. This begs the question. Plaintiff must connect that fact to BCBS's agreement to the exclusive contract, and plaintiff has not met its burden.

As for the other exclusive contract with MVP, the record describes complex negotiations between the Hospital and MVP in several service areas. There are simply no viable facts to support an inference of anything but negotiation. The complaint itself lists the long-wanted benefits MVP received as a result of agreeing to the exclusive contract; discounts in outpatient surgery, a fixed three year term, and a new reimbursement structure.

Furthermore, as defendants point out, the third party payers received discounts in outpatient rates in exchange for the exclusive contract. (Docket No. 124, Ariglio Aff. ¶ 16, 25.) Plaintiff is unable to point to any discounts in the alleged tied product, in-patient rates, as plaintiff alleged in its second amended complaint.

Defendants have met their initial burden of pointing to material facts tending to show there is no genuine issue for trial. RASC has done no more than "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. at 1356. Defendants' motion for summary judgment must be granted as to both tying claims.

### b. *Illegal Exclusive Contract (Third Cause of Action)*

Plaintiff claims that the Hospital's contracts for ambulatory surgery services with the commercial health plans are illegal exclusive contracts which foreclose a significant degree of the Rome area third party payer submarket. The Hospital acted to obtain an exclusive contact with MVP and BCBS at its first opportunity. It took longer to obtain an exclusive arrangement with BCBS than MVP, but it was the focus of negotiations as soon as the Hospital discovered RASC's pending market entry.

The claim is subject to the rule of reason analysis because the contracts at issue are not of the pernicious type conclusively presumed to be unreasonable. Indeed, courts have approved vertical arrangements between hospitals and providers and recognized the competitive benefits. *See Jefferson Parish,* 466 U.S. at 29, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2; *See also CDC Technologies, Inc. v. IDEXX Laboratories, Inc.,* 186 F.3d 74, 80 (2d Cir.1999): *Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129 F.3d at 245.

Under the rule of reason analysis plaintiff must demonstrate (1) anti-competitive market effects; (2) that the alleged conduct foreclosed a significant degree of trade; and (3) that the defendants' procompetitive justification for the conduct is not valid. The analysis below proceeds accordingly, mindful of the fact that to survive summary judgment plaintiff only needs to raise a question of material fact as to each issue.

### (1) *Anticompetitive Effect*

RASC must demonstrate that the challenged activity "has had an actual adverse effect on competition as a whole in the relevant market." *Finkelstein v. Aetna Health Plans,* No. 95 CIV. 6631, 1997 WL 419211 (N.D.N.Y. July 25, 1997) (*citing Capital Imaging Assoc.,* 996 F.2d at 543.) As explained above plaintiff has two options for demonstrating anti-competitive effects; competition-reducing effect through evidence of actual effects or by a showing of market power. *Capital Imaging Assoc.,* 996 F.2d at 546.

Plaintiff may demonstrate actual adverse effects on the market by a showing reduced output, increased prices, decreased quality, or the imposition of entry barriers. *CDC Technologies, Inc.,* 186 F.3d at 80; *Tops Mkts.,* 142 F.3d at 96; *Moccio,* 208 F.Supp.2d at 379. Plaintiff alleges that defendants harmed competition in eliminating the benefits RASC provided to consumers while it operated: lower prices, greater customer choice, and higher quality service. (Amended Complaint ¶ 135) Defendants respond that RASC has not demonstrated actual consumer benefits, but illusory ones.

Beginning with price benefits, commercial payers paid approximately 35 percent lower rates during RASC's tenure. (Docket No.135, Ex. 16, BCBS Internal Document, BC 000069.) Furthermore, it was RASC's presence in the market as a competing contractor that made it possible for the payers to negotiate those rates. RASC presented an opportunity to pressure the Hospital. It would be a reasonable inference that RASC's market presence decreased the market price of ambulatory surgical services and that the exclusive contract preventing RASC's from further competition in contracting caused RASC's failure (and/or inability to compete effectively due to an antitrust injury) and deprived consumers of that benefit.

As to the other market effects, patient choice and quality are challenging to quantify, but they are especially relevant here

considered in combination with a demonstrated market price reduction. Certainly, RASC's closure resulted in a loss of choice for Rome area patients. While antitrust policy is not aimed to protect competitors at the sake of market efficiency, the loss of choice is a significant injury to competition.

Demonstrating any given market participant's effect on the quality of a product or service in the market at a particular time is a complex task. Plaintiff's attempt consists of citing survey responses of Hospital patients, statements regarding the Hospital's own CoN application describing the unfavorable conditions of Hospital facilities, and by providing RASC patient testimonials. The weight of such offerings will be left to a fact finder.

While defendants make some persuasive arguments to refute the above averments on price, choice, and quality, the issue of anticompetitive effects remains disputable. Plaintiff has met its burden in this regard.

### (2) *Unreasonable Restraint*

■ Plaintiff must demonstrate that the exclusive contracts unreasonably restricted trade by foreclosing a significant part of the relevant market. While "significance" varies, it is clear that the "plaintiff must both define the relevant market and prove the degree of foreclosure." *U.S. v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C.Cir.2001)

■ For the purpose of this claim, plaintiff has narrowly defined the market as the "submarket for commercial health plans in the greater Rome area," (Second Amended Complaint ¶ 26), the largest of which are BCBS and MVP. Defendants do not dispute that this is a relevant market in which the Hospital could have restrained trade but only plaintiff's method of defining it and the allocation of market share within it.

Case law supports the proposition that a 40% foreclosure is likely an unreasonable restraint. *See Microsoft Corp.*, 253 F.3d at 70. Plaintiff claims that defendants foreclosed 65% of the relevant submarket. Plaintiff allocated the proportionate shares of market payers in accordance with what the Hospital received from commercial payers in relation to what the hospital received from the government, self pay and workman's compensation payers. (Docket No. 138 Ex. G Schatell Dec.) Plaintiff concludes that in 2000 commercial payers made up 49% of Hospital's revenue. BCBS represented roughly 40% of that revenue. The Hospital's payer mix for 1999 was similar, with commercial payers representing 54% of revenue and BCBS constituting almost 39% of that revenue. (Docket No. 121, Dennison Dec. ¶ 24).

A fact finder might reasonably infer that the Hospital was a large enough player in a relatively small market, as plaintiff narrowly defined it, that its payer mix ratio was a reasonable basis for determining market share of its customers. The instant case is not like the example defendants offer in their memorandum, a small medical practice that derives 90% of its income from an exclusive contract with a payer. Defendants' burden here is to provide a conclusive or undisputable alternative allocation formula such that plaintiff could not have foreclosed a legally unreasonable portion. Defendants have not attempted this and as such questions of fact remain.

### (3) *Procompetitive Justification*

■ Under the rule of reason analysis, defendants may defeat plaintiff's illegal exclusive contracting claim by demonstrating that the alleged conduct, however restraining, had procompetitive effects. Defendants' proffered justification is two-fold;

first that the conduct was justified in competitive "self-defense" in response to RASC physician investor's ability and motive to steer patients towards their own facility, and second, that there is an efficiency gain in high volume contracts

This claim addresses defendants' exclusive contracts with the commercial payers. It is difficult to see how exclusive contracting would be considered an appropriate response to the particular behavior defendants claim to be defending against, "cherry picking" or "cream skimming," and possible "free riding" by the RASC investor physicians. Defendants argue that they would have been permitted to exclude those physicians from hospital privileges altogether. Perhaps, and that may have been a more appropriate response, but it is not a defense to the issue of the exclusive contracts. The logical disconnect in defendants' argument is sufficient to raise a question of fact as to its justification.

Defendants also offer that exclusive contracts are not only common, but often considered procompetitive. The MVP and BCBS contracts allegedly benefit competition because they allow for efficiency gains. The greater number of surgeries would provide sufficient volume to allow for some economy of scale which allows for reduced prices or increased input. While the rationale is sound, questions remain as to whether this was actually applied here.

Defendants state that the discounted price to payers proves that the rationale worked here. Interestingly, defendants' own expert, William Lynk, provides the counter argument. Short-term loss for the sake of long-term gain is a legitimate business decision. The lower rates, could simply have been used to secure the contact. While Hospital's maintaining volume certainly could contribute to beneficial pricing as defendants and their expert state, it is not clear that that is what was

intended or what occurred here. Maintaining patient volume is certainly good for the Hospital, but defendants have not conclusively demonstrated that it in any way benefitted competition.

Plaintiff has raised questions of fact as to the anticompetitive effect, market foreclosure, and defendants' procompetitive justification of defendants' exclusive contracts with MVP and BCBS. Defendants' motion for summary judgment as to illegal exclusive contracting will be denied.

### c. Market Allocation (Fourth Cause of Action)

Plaintiff alleges that defendants and cooperating physicians agreed not to compete with each other in certain markets, thereby allocating those markets to each other. This conduct is alleged to be both per se illegal in and of itself, and intended to effectuate a conspiracy to eliminate RASC as a competitor. Defendants oppose by objecting to a per se classification of the claim. Plaintiff failed to respond to defendants' motion in opposition papers or any of the numerous accompanying submissions. Plaintiff has effectively abandoned the claim. See Douglas v. Victor Capital Group, 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (collecting cases).

### d. Conspiracy to Restrain Trade (Fifth Cause of Action)

Plaintiff alleges that the Hospital and Rome area cooperating physicians, including RMG, conspired to restrain trade in the outpatient surgery market. To establish a conspiracy in restraint of trade violation, a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) the combination or conduct constituted an unreasonable restraint of trade either

per se or under the rule of reason. *Tops Mkts.*, 142 F.3d at 96.

A rule of reason analysis will be applied here because though plaintiff is not specific as to exactly who defendants conspired with, the candidates, RMG and/or other CNYMA cooperating physicians, and the Hospital are in vertical market relationships. Vertical refusals to deal are agreements among persons or organizations at different levels of the market structure not to deal with other market participants. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.1978); *Commercial Data Servers, Inc. v. IBM*, No. 00 Civ. 5008, 2002 WL 1205740, *2–3 (S.D.N.Y. March 15, 2002). Defendants are suppliers of surgical services and the alleged co-conspirators are the customers who bring patients, the actual buyers. There are only two rationales that would allow for per se treatment of this vertical arrangement. The first is price fixing. See *Moccio*, 208 F.Supp.2d at 378 –379. The alleged agreements, between the Hospital and the cooperating physicians, are non-price agreements.

■ In support of applying the other per se rationale, plaintiff cites *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), where the court did apply per se treatment to a vertical agreement. But *Klor's* is distinguishable. The case involved a vertical agreement between supplier and a customer in combination with a horizontal agreement among the competing customers. The court found a "combination of manufacturers, distributors and a retailer." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998); *See Business Electronics*, 485 U.S. 717, 734, 108 S.Ct. 1515, 1524, 99 L.Ed.2d 808 (1988). Plaintiff simply has

not set forth sufficient facts from which to infer any horizontal agreement between the Hospital's customers, CNYMA physicians and/or RMG. Business relations and opportunity to conspire are not sufficient in and of themselves for inferring agreement. "A mere showing of close relations or frequent meetings between the alleged conspirators ... will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement." *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir.1980). Accordingly, a rule of reason analysis is required.

■ Assuming *arguendo*, that plaintiff could demonstrate concerted activity sufficient to constitute a conspiracy, plaintiff's claim fails due to its failure to raise a question of fact as to anticompetitive effects or the unreasonableness of any restraint that may have occurred. Under a rule of reason analysis plaintiff bears the initial burden of demonstrating that the defendants' conduct or policy has had a substantially harmful effect on competition. *See Capital Imaging Assocs.*, 996 F.2d at 547. As explained above, plaintiff has two options for demonstrating anticompetitive effects, direct evidence of actual effects on competition or a demonstration of market power coupled with a showing that the "arrangement has the potential for genuine adverse effects on competition," for example, substantial market foreclosure. *Capital Imaging Assocs.*, 996 F.2d at 546 (*quoting Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986)).

Plaintiff attempts the former method and may satisfy this burden of proving the actual anticompetitive effects by showing a reduction of output, increase in price, or deterioration in quality of goods and services. *Angelico v. Lehigh Valley Hosp.*,

*Inc.*, 184 F.3d 268, 276 (3d Cir.1999) Plaintiff states in conclusory fashion that there are clear restraints on price, choice, and output as a result of the alleged conspiracy.[9] Plaintiff's demonstration of such effects not only is insufficient to support its motion for summary judgment, it fails to satisfy RASC's burden of raising a triable issue to survive defendants' like motion.

The effect of an alleged restraint is evaluated in the context of the particular facts of a case. What plaintiff has effectively demonstrated is the strength of the referral networks along the CNYMA and RAPO lines prior to RASC's tenure. It seems that to show any effect of an alleged conspiracy plaintiff must argue that the market would have been different, less restrained, in its absence. Furthermore, plaintiff must attempt to quantify that effect in some way to demonstrate that the effect is a significant restraint. Market foreclosure is of course one option, but having declined that method, plaintiff neglects to offer another.

Plaintiff does claim that consumer choice was reduced. Assuming plaintiff means patient choice, RASC fails to explain how the alleged conspiracy did that more than the established referral network did. As defendants' expert, Thomas Dennison, points out, without some added incentive to change, physicians would be unlikely to alter their well established referral patterns just because RASC entered the market.

There is an overwhelming overlap between the alleged conspiracy and the already established referral networks. The network itself has not been opposed, is not at issue and is thus presumed a legitimate business network. This overlap makes it more difficult to demonstrate an effect of the conspiracy as opposed to the effect of the network. The difficulty, however, does not relieve plaintiff of the burden and the attempt made through a few conclusory statements is insufficient in the context of the instant case. Defendants' motion for summary judgment will be granted in regard to this cause of action because plaintiff has failed to demonstrate anticompetitive effects or an unreasonable restraint due to the alleged conspiracy between the Hospital and the cooperating physicians as required under a rule of reason analysis.

### e. *Per se Illegal Boycott (Sixth Cause of Action)*

Plaintiff alleges that the Hospital's inducement of BCBS and MVP into exclusive contracts, and the tacit conspiracy among defendants and the two payers to

9. It is noted that the effects of the exclusive contracts are not considered for purposes of this claim. First, the second amended complaint refers only to the physician conspirators in stating its claim. Secondly, to be considered as part of the conspiracy plaintiff would have to make some attempt to show that the payers were part of the conspiracy. Unlike the proof required to establish a conspiracy to monopolize under section 2, a specific intent to create a monopoly is not required under section 1. *International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793–794 (2d Cir.1987). At a minimum, however, " 'the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement,' " *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.1976) (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)), cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). Plaintiff has not attempted this showing and without more facts than the record contains it is not plausible to infer that the third party payers participated in a conspiracy to limit the number a patients that used RASC. Both payers benefitted from RASC's presence by way of lower prices and in using it as a negotiating tool against the Hospital.

eliminate RASC from the market constitutes a per se illegal boycott.

▪▪▪▪ A per se illegal boycott is an agreement among competitors within the same market tier not to deal with other competitors or market participants. *See Topco Assocs.*, 405 U.S. at 608, 92 S.Ct. at 1133; *Bogan v. Hodgkins*, 166 F.3d 509, 516 (2d Cir.1999); *Oreck Corp.*, 579 F.2d at 131. Such concerted action is usually termed a horizontal restraint, in contradistinction to combinations of persons at different levels of the market structure, e. g., manufacturers and distributors, which are termed vertical restraints. *Topco Assoc.*, 405 U.S. at 608, 92 S.Ct. at 1133. Horizontal group boycotts are per se illegal. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. at 135, 119 S.Ct. at 493; *Primetime 24 Joint Venture*, 219 F.3d at 102; *see Bogan*, 166 F.3d at 514.

▪▪▪▪ The market relationships between the Hospital and the commercial payers are analogous to the relationship between the Hospital and the referring physicians. Defendants are suppliers of surgical services and the alleged co-conspirators are the customers who bring patients, the actual buyers. As explained above, per se treatment does not apply to vertical arrangements absent alleged price fixing and *Klor's* will not be applied to otherwise trigger a per se analysis in absence of evidence of a horizontal agreement. Thus, in order to receive per se treatment, and thus any treatment at all as the claim is pleaded, plaintiff must show a horizontal agreement between MVP and BCBS. No such finding would be reasonable here.

Plaintiff has failed to raise a question of fact as to a possible agreement or understanding between MVP and BCBS concerning RASC. Plaintiff fails to point to specific facts to support any such inference. The MVP contract was entered into prior to the time that Hospital first suggested an exclusive contract to BCBS. There is no reason to draw an inference that MVP, at the time it was negotiating with the Hospital, was considering BCBS or RASC in any way, let alone that it would have agreed with BCBS to boycott RASC.

BCBS knew of MVP's exclusive contract with the Hospital during its contract negotiation with the Hospital, but deposition testimony reveals simply that they used the information to negotiate better deals with both the Hospital and RASC. (Bozer Dep. pp. 58–61). Defendants' motion for summary judgment will be granted as no reasonable fact finder could infer any agreement or tacit conspiracy between the third party payers based on the instant record. Per se treatment is not applicable, and thus this cause of action fails.

## 2. § 2 Sherman Act Claims (Seventh through Tenth Causes of Action)

Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" has violated the law. 15 U.S.C. § 2.

### a. Monopoly Leveraging and Monopolization of the Outpatient Surgery Market (Seventh and Ninth Causes of Action)

▪▪▪▪ Plaintiff's second amended complaint alleges that defendants used their monopoly power in the general inpatient acute care hospital services market to harm plaintiff in the secondary, outpatient ambulatory services market. It is "unreasonable, per se, to foreclose competitors from any substantial market." *International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20

(1947). The anti-trust laws are as much violated by the prevention of competition as by its destruction. *United States v. Aluminum Co. of America*, 148 F.2d 416, 428 (2d Cir.1945). Thus the use of monopoly power, "however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948).

■ The plaintiff's monopoly leveraging and monopolization causes of action differ only in the alleged effect in the second market, an unfair competitive advantage and acquisition of monopoly power. Monopoly leveraging claims address the use of monopoly power in one market to gain an unfair competitive advantage in a second market. To prove a monopoly leveraging claim in the Second Circuit, the plaintiff must establish that the defendant: "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage . . . in another distinct market; (3) caused injury by such anticompetitive conduct; and (4) demonstrate that there is dangerous probability of success in monopolizing a second market." *N.Y. Mercantile Exch., Inc. v. Intercontinental Exchange, Inc.*, 323 F.Supp.2d 559, 572 (S.D.N.Y.2004) (citations omitted).

■ As plaintiff has framed its monopolization cause of action, § 2 Sherman Act also forbids the use of monopoly power to "beget monopoly" in another market.[10] *See United States v. Griffith*, 334 U.S. at 108, 68 S.Ct. at 946. To establish a § 2 violation for completed monopolization, a plaintiff must produce evidence sufficient to prove the defendants: (1) possessed monopoly power in a relevant market; and

(2) willfully acquired maintained that power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990)..

■ Both causes of action require plaintiff to demonstrate monopoly power in the general inpatient acute care market. RASC may allege monopoly power by pleading: (1) power to control prices or exclude competition; or (2) possession of a predominant share of the relevant market. *Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. 1698; *Bonded Concrete, Inc. v. D.A. Collins Constr. Co.*, No. 01–7682, 29 Fed. Appx. 725, 726–27, 2002 WL 284878 (2d Cir. Feb.25, 2002).

Plaintiff has not satisfied either option. As far as direct evidence of the power to control prices or exclude competition, the record only addresses defendant conduct in the outpatient market. For example, plaintiff claims that success of the alleged conspiracy in restricting referrals to RASC and its ability to foreclose part of the market through exclusive contracting demonstrate defendants' power to exclude competition. While raising questions of fact as to defendants' power in the second market, that evidence will not be accepted as evidence on which to infer power back into the inpatient market, certainly not to the point of monopoly power.

■ The usual method of demonstrating monopoly power is the second option, showing that the defendant possesses a predominant share of the relevant market. It is "a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the rele-

---

**10.** "Defendant Rome Hospital has, through the anticompetitive, exclusionary and predatory conduct described above, used its power in the market for general inpatient acute care hospital services to obtain monopoly power in the market for outpatient surgery." Second Amended Complaint ¶ 198.

vant markets." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979). This is so because "[w]ithout a definition of that market, there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965).

Plaintiffs have the burden of defining the relevant product market. *See Hack v. President and Fellows of Yale College*, 16 F.Supp.2d 183, 196 (D.Conn.1998). This requires the plaintiff to define the market in which such power is held. In neither the voluminous record nor motion memorandum does plaintiff attempt to define the inpatient market or defendants' share of it. The only plaintiff evidence towards this requirement is found in a financial report prepared for the defendants in 1998 that includes a projected market share for defendants during the time of RASC's tenure. (Docket No.136 Ex. 37, Coopers & Lybrand Report.) This is insufficient; it is only a prediction and the methodology is not adequately explained. *See, e.g., Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*, 309 F.3d 836, 840 (5th Cir.2002). Indeed, documents submitted by defendants reveal that this failure to define the inpatient market was not an oversight, but a strategic litigation decision. (Docket No. 158, Buckel Reply Aff. Ex A.)

The leveraging claim (*Seventh* Cause of Action) fails because it is based on the exercise of monopoly power in the inpatient services market, and plaintiff failed to define that market in order to show market share or, alternatively, to offer direct evidence of defendant's power to "control prices or exclude competition" within it. Plaintiff's monopolization (*Ninth* Cause of Action) claim fails for the same reason because plaintiff framed the cause of action in the same manner as the leveraging claim, in reliance on the use of monopoly power in the inpatient services market which it subsequently declined to define. Defendants' motion for summary judgment on both claims must be granted.

**b. Attempted Monopolization of the Outpatient Surgery Market (Eighth Cause of Action)**

 Plaintiff alleges that the Hospital's alleged conduct was part of an attempt to monopolize the outpatient surgery market. Attempted monopolization is proven when a plaintiff can show "(1) that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) has a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–891, 122 L.Ed.2d 247 (1993). Plaintiff has raised a question of fact as to all three requirements. These will be addressed in turn.

**(1) Predatory or Anticompetitive Conduct**

 Plaintiff relies on the conduct alleged under its § 1 Sherman Act claims to demonstrate anticompetitive conduct for purposes of its § 2 Sherman Act claim. In review, that conduct includes a conspiracy and physician intimidation to restrict referrals to RASC, and illegal exclusive contracts. The alleged conduct would be sufficient to sustain a claim under § 2. The question becomes whether defendants have a sufficient business justification for that conduct.

The Second Circuit has not articulated precise rules for what constitutes anticompetitive conduct for this claim, and thus there is no simple rule for determining when behavior is anticompetitive and when it is efficient and pro-competitive. As the Supreme Court has acknowledged, "it is

sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects." *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. at 892. The question to be answered is the fact-specific question whether the challenged conduct is "exclusionary" or "predatory." *Creative Copier Servs. v. Xerox Corp.,* No. CIV.A. 3:01CV155SRU, 2004 WL 2600436 (D.Conn. November 15, 2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 602, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467 (1985).

Defendants offer two justifications, one for each category of alleged conduct. As for passing the bylaw and any efforts that may be found to limit referrals to RASC, defendants argue that they were justified in light of the potential for "cream skimming" by the RASC physicians. Defendants offer an efficiency rationale for entering into the exclusive contracts. They claim that they were able to offer lower prices if they could be assured of increased volume in patients. Defendants argue that the exclusive contracts were just run of the mill volume discount agreements. As discussed above, under the illegal exclusive contract claim, questions of fact remain as to defendants' justifications.

### (2) *Intent to Monopolize*

Specific intent to destroy competition or build monopoly is essential to be guilty of attempt. *Tops Mkts.,* 142 F.3d at 101 (*quoting Times–Picayune Publ'g Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953)). Proof of the first element of an attempted monopolization claim, anticompetitive or exclusionary conduct, may be used to infer the second element. *Volvo North America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55, 74 (2d Cir. 1988). This is true where the conduct that is alleged to be predatory forms the basis

for the substantive claim in restraint. Here the conduct at issue also supports a viable claim for illegal exclusive contracting and, as explained below, a viable claim for conspiracy to monopolize. A reasonable inference of intent is possible based on that combination of conduct.

### (3) *Dangerous Probability of Achieving Market Power*

To allege a dangerous probability of achieving monopoly power, plaintiff must plead that defendants possess a sufficient share of the relevant market. *AD/SAT v. Assoc. Press,* 181 F.3d 216, 226 (2d Cir.1999); *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990); *see Tops Mkts.,* 142 F.3d at 100. Plaintiff asserts that the Hospital held a 70% market share before and after RASC's tenure. This 70% share is generally accepted as an indication of monopoly power, and if proven would be sufficient to support its claim. *Tops Mkts.,* 142 F.3d at 101; *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 999 (11th Cir. 1993) (finding that a 60 or 65% market share is sufficiently large to create a genuine issue of material fact as to whether there was a dangerous probability of success); *see also H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1017 (2d Cir.1989) (holding a dangerous probability of monopoly may exist where a party possesses a significant market share at the time it undertakes the challenged anticompetitive conduct); *International Distribution Centers v. Walsh Trucking,* 812 F.2d 786, 791 (2d Cir.1987) (same); 3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, P 801a, at 301 (1996) (suggesting it is reasonable to presume substantial market power when defendant's share of relevant market exceeds 70–75% for the five years preceding the complaint). "Critical to deciding the dangerous probability prong of [an]

attempted monopolization claim is defendant's economic power in the relevant market. ... Attempted monopolization requires some degree of market power." *Tops Mkts.*, 142 F.3d at 100 (citations omitted).

■■ Thus, plaintiff must allege the scope and boundaries of the relevant market sought to be monopolized. See *Spectrum Sports*, 506 U.S. at 455, 113 S.Ct. 884, 122 L.Ed.2d 247; *Eastman Kodak Co.*, 504 U.S. at 481–82, 112 S.Ct. at 2072; *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). To define the relevant market, plaintiffs must allege the relevant geographic and product markets. *See AD/SAT*, 181 F.3d at 226.

■■ The relevant product market is comprised of products which are generally interchangeable or for which there is cross-elasticity of demand. See *Eastman Kodak Co.*, 504 U.S. at 481–82, 112 S.Ct. at 2072; *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir.2001); *Hack*, 237 F.3d at 86–87. The parties do not dispute that ambulatory surgery is the relevant product. The appropriate geographic market definition however is thoroughly disputed by both side's experts.

■■ The relevant geographic market is that area where purchasers may practically turn for the goods comprising the relevant product market or that area where producers of the relevant product effectively compete. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 331–32, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir.1995); *see also United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 979 (2d Cir.1984).

Plaintiff has come forward with sufficient evidence to create a genuine issue of material fact regarding the scope of the market. Whether or not defendants have a predominant market share depends on how the "greater Rome area" market is defined. As just noted, market definition, by any approach, must consider both the geographic market in which the defendant competes, and then the available substitutes for product within that market. Plaintiff has drawn the boundaries of the outpatient surgery market such that, absent RASC, defendants are the only suppliers in it. Such narrowing is suspect and naturally defendants complain and offer their own market definition by way of their own expert.

The market definition dispute centers on the use of the Eliza–Hogarty method of market definition.[11] The parties claim that the other's expert failed in application of this method to the instant market. It seems both parties strayed from a pure application, but that need not be resolved at summary judgment. The results of an Eliza–Hogarty analysis are not dispositive in defining the relevant market. To sur-

---

11. In short, this method amounts to designating the smallest geographic area from which a certain percentage of defendants' patients originate. This is the competitor's "service area." The requisite percentage is in dispute, but the range is between 75 and 90%. The second step is to determine the substitutes available within that market to those original patients. The third step consists of considering the additional patients that those competitors serve. The thinking is that if part of the competitor's market can or would use the alternatives available then they all might use them in response to a price increase or quality decrease. The geographic market is then redrawn to include a threshold percentage of the substitute suppliers' originating patients. The number of patients in the total market is found according to that second drawing. The number of the patients the competitor serves is placed (in the numerator) over the number of patients served by both the competitor and the substitutes combined (the denominator) to arrive at the competitor's market share.

vive this summary judgment motion the plaintiff need only demonstrate that its market definition would be proper as a matter of law, and provide sufficient data to justify a reasonable inference. The plaintiff has managed this burden, which is of course not to express an opinion on plaintiff's ability to do so at trial.

Plaintiff has raised material issues of fact as to the relevant geographic market. First, plaintiff's E–H test application defines a market at the lower-but-reasonable-in-some circumstances 75% E–H market share threshold. Plaintiff has raised the question of whether defendants' preferred 90% E–H threshold requirement may be inappropriate in the health care market.

 Second, as defendants assert, defining a relevant product market is "a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *Hayden Pub. Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 71 (2d Cir.1984) (internal quotation marks and citation omitted). Considering that a "court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [alternatives]" plaintiff offers an explanation for not considering area hospitals as substitute suppliers within its market. *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1354 (S.D.N.Y.1982).

 Plaintiff has demonstrated that significant market actors did not view the substitute suppliers that defendants point to within Rome's geographic market as actual substitutes. Industry recognition is well established as a factor that courts consider in defining a market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

It is significant because "we assume that the economic actors usually have accurate perceptions of economic realities." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n. 4 (D.C.Cir.1986); *See Todd*, 275 F.3d at 205. BCBS for example testified that they considered RASC an opportunity to pressure the Hospital for lower rates being unable to use the other area hospitals as effective substitutes for that purpose.

 Assuming plaintiff can prove a predominant market share, its burden is not met. "Courts only infer monopoly power based on predominant market share after considering other relevant factors, such as competitive levels within the relevant market, entry barriers to the relevant market, the nature of the anticompetitive conduct at issue and the elasticity of consumer demand." *Moccio*, 208 F.Supp.2d at 376 (*citing Tops Mkts.*, 142 F.3d at 98.) For purposes of § 2 of the Sherman Act, a market share between 50% and 70% can occasionally show monopoly power, but only if other factors support the inference. *Pepsico, Inc. v. Coca–Cola Co.*, 315 F.3d 101 (2d Cir.2002)

Plaintiff argues that these other factors are present. New York State's CoN process constitutes a significant entry barrier. Plaintiff's expert has explained that surgery patients may be inelastic in demand as they chose where they have surgery based on other factors than just price, but also location and perceptions of quality due to a Hospital's reputation. The weight of such factors is left to the fact finder, here it is enough that plaintiff has raised them and supported them in the record.

Defendants' motion for summary judgment on the attempted monopolization claim must be denied as plaintiff has raised triable issues as to anticompetitive

effects, defendants' intent and the probability of success of an alleged conspiracy.

### c. *Conspiracy to Monopolize the Outpatient Surgery Market (Tenth Cause of Action)*

■ Plaintiff alleges that the Hospital has conspired with Rome area cooperating physicians to monopolize the outpatient surgery market.[12] This is alleged as a separate and distinguishable conspiracy from the alleged effort to not use RASC for ambulatory surgery in restraint of trade.[13]

■ To sustain its claim, plaintiff must demonstrate concerted action, overt acts in furtherance of conspiracy, and specific intent to monopolize. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; *Discon, Inc. v. NYNEX Corp.* 93 F.3d 1055 (2d Cir.1996) (vacated and remanded on other grounds). Unlike the elements required to establish an attempt to monopolize, proof of a conspiracy to monopolize does not require a dangerous probability of success. *International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir.1987). Also, a conspiracy to monopolize violates § 2 even though monopoly power was never acquired. *American Tobacco Co. v. United States*, 328 U.S. 781, 789, 66 S.Ct. 1125; *United States v. Griffith*, 334 U.S. at 107, 68 S.Ct. 941.

Both parties have moved for summary judgment claiming the other cannot raise an issue of material fact. Neither party has so conclusively demonstrated their view of the facts to preclude the need for a fact finder.

■ Beginning with the requirement of concerted action, "[i]t is not necessary that such a combination be established by direct proof of oral or written agreements; it may be proven by inferences drawn from circumstantial evidence, including the acts and conduct of the alleged conspirators." *Oreck Corp.*, 639 F.2d at 79 (*citing Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969)). At a minimum, however, "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Reborn Enterprises, Inc. v. Fine Child, Inc.*, 590 F.Supp. 1423, 1436–1437 (S.D.N.Y.1984) (*quoting American Tobacco Co. v. United States*, 328 U.S. at 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

Plaintiff alleges that RMG only referred ambulatory surgery patients to specialists who used the Hospital. In return, RMG allegedly received direct and indirect financial benefits. Plaintiff provides the following facts from which to infer such an agreement. Plaintiff's expert offers statistics to suggest that referral rates demonstrate the existence of a conspiracy. In 2000, CNYMA physicians performed 1731 ambulatory procedures at the Hospital and only two at RASC. The record contains evidence of significant financial dealings between the Hospital and RMG. It was the Hospital Director that negotiated managed care contracts on behalf of CNYMA/RMG physicians. The record contains evidence

---

**12.** The second amended complaint does not allege that the third party payers were part of this conspiracy. As explained in footnote No. 8 above, where Conspiracy to Restrain Trade (*Fifth* Cause of Action) was discussed, MVP and BCBS will not be considered under this cause of action.

**13.** The Sherman Act requires proof of conspiracies that are "reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap." *American Tobacco Co.*, 328 U.S. at 788, 66 S.Ct. 1125.

of RMG efforts to maintain its referral network which used the Hospital. There is testimony that the doctors who did get referrals from RMG physicians knew they should perform the procedures at the Hospital and not RASC (Dr. Ajay Goel, Dr. John Costello). Plaintiff adds that the Hospital's solicitation of letters opposing its CoN and RMG physician responses demonstrate a shared motive between the co-conspirators.[14] It would be a reasonable inference that the Hospital conspired to restrict referrals to RASC.

However, defendants have submitted physician testimony that their referral decisions were not influenced by anything but patient welfare. Defendants argue that Hospital's purchase of RMG followed RASC's closure and shouldn't contribute to an inference of motive for an agreement. Defendants point out that RMG's consideration of sale to St. Elizabeth's in the same month RASC opened, detracts from an inference that RMG and the Hospital were co-conspirators. They claim that it would be a reasonable inference that Hospital and RMG did not conspire to restrict referrals to RASC.

The submitted evidence and the reasonable inferences to be drawn from it require both credibility assessments of the various witnesses and a weighing of the various political and economic factors that would motivate the alleged conspirators conduct. Such is the role of a fact finder.

Defendants cite *Matsushita* and *Monsanto* and the antitrust summary judgment standard to complain that the conduct at issue here is consistent with independent action and thus plaintiff must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775. What *Monsanto* says however is that conduct consistent with permissible competition as with legal conspiracy does not, without more, support even an inference of conspiracy". *Monsanto*, 465 U.S. at 763–764, 104 S.Ct. 1464. The "more" referred to can be motive, which is reasonably alleged here. As one court explained:

> When plaintiffs' proof of a conspiracy relies on circumstantial evidence of defendants' conduct, in the summary judgment context, the Supreme Court has instructed that if defendants can demonstrate that they had no rational economic motive to participate in an anti-competitive conspiracy, and that the conduct at issue is consistent with permissible activity under the antitrust laws, such conduct does not give rise to an inference of conspiracy unless plaintiffs come forward with evidence that tends to exclude permissible explanations for the conduct.

*Jessup v. American Kennel Club. Inc.*, 61 F.Supp.2d 5, 11 (S.D.N.Y.1999) (*citing Matsushita Electric*, 475 U.S. 574, 596–97, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *H.L. Hayden Co.*, 879 F.2d 1005, 1014 (2d Cir.1989)). Here, defendants have not even argued that the co-conspirators "had no rational economic motive to participate." Plaintiff escapes this extra burden.

---

**14.** Defendants argue that the Noerr–Pennington doctrine would apply here to insulate them from suit based on their protected right to petition the government despite any antitrust implications of their acts. Plaintiff argues that a "sham" exception to the doctrine applies to allow suit. The activities taken in opposition to RASC's CoN are one of several facts listed as background to support the inference of a conspiracy, not the subject of the action. A decision on the application of immunity, or any exception, is not required for purposes of this summary judgment motion as plaintiff has set forth sufficient facts regardless.

The allegations refer to numerous overt acts in furthering the conspiracy, the parties thus turn to the requirement of proving specific intent to monopolize. If "one party's intent to monopolize is not shared by another party, there can be no conspiracy to monopolize." *CDC Techs.*, 7 F.Supp.2d at 131 (*citing Belfiore v. New York Times Co.*, 826 F.2d 177, 183 (2d Cir.1987)). Plaintiffs allege the Hospital and RMG shared the intent to monopolize the outpatient market because while RASC's failure benefitted the Hospital, it also benefitted RMG. As noted above, determining intent on the instant record is not possible, credibility and the weighing competing pressures is required.

Since questions of fact remain as to whether or not a conspiracy existed and what the alleged co-conspirators intended if they did so conspire, both parties motions for summary judgment will be denied.

### D. *State Law Claims*

Plaintiff brings two state law claims based on the Hospital's exclusive contracts for ambulatory surgery with the commercial payers: (1) Intentional Interference with Contractual Relations; and (2) Interference with Business Relations.

### 1. *Intentional Interference with Contractual Relations (Eleventh Cause of Action)*

Under the first claim, plaintiff alleges that the Hospital interfered with its BCBS contract when it contracted with BCBS in the fall of 2000 for an exclusive in ambulatory surgery beginning in 2001. By its own terms, the RASC and BCBS contract terminated at the end of 2000. BCBS did not breach its contract with RASC. With proper notification, BCBS simply exercised its option not to renew. Under New York law, a breach of contract is required to bring a claim for tortious interference with contractual relations. *NBT Bancorp v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 620–621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (N.Y.1996) (*see, e.g., Gregoris Motors v. Nissan Motor Corp.*, 80 A.D.2d 631, 632, 436 N.Y.S.2d 90 (App.Div.1981) *aff'd.* 54 N.Y.2d 634, 442 N.Y.S.2d 505, 425 N.E.2d 893 (N.Y.1981); *Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 1080, 396 N.Y.S.2d 347, 364 N.E.2d 1119 (N.Y.1977)). Accordingly, defendants' motion for summary judgment on the interference with contractual relations claim must be granted.

### 2. *Interference with Business Relations (Twelfth Cause of Action)*

Under the second claim, plaintiff alleges that defendants interfered in its business relations with MVP. MVP stated that it intended to contract with RASC when it supported RASC's CoN application. The Hospital allegedly prevented the prospective contract by entering into an exclusive contract with MVP before RASC opened.

To prevail on a tortious interference claim, a plaintiff in New York must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. *Carvel Corp. v. Noonan*, 350 F.3d 6 (2d Cir.2003) (*citing Goldhirsh Group v. Alpert*, 107 F.3d 105 (2d Cir. 1997)). Only the third element is disputed by the defendants, whether defendants conduct constitutes tortious interference. Defendants focus on plaintiff's inability to prove malice, but as the element reads, there is an alternative in proving dishonest, unfair, or improper means.

The conduct that constitutes "interference" under New York law varies. "The degree of protection available to a plaintiff for a competitor's tortious interference with a contract is defined by the nature of the plaintiff's enforceable legal rights." *NBT Bancorp v. Fleet/Norstar Fin. Group,* 87 N.Y.2d at 621, 641 N.Y.S.2d 581, 664 N.E.2d 492. This protection is balanced against the desire not to interfere in the competitive process. Where the rights are strongest, during the term of a valid and performed contract, even lawful conduct that results in a breach may be the basis of liability for tortious interference. But absent that contract, plaintiff has only an expectation of business and the value of competition is given greater weight. In order for liability to attach plaintiff must show "more culpable conduct on the part of the defendant." *Id.*

The New York Court of Appeals recently addressed the issue of what constitutes "more culpable" conduct in *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004). While answering certified questions from the Second Circuit concerning New York's law of tortious interference it noted that as a general rule the defendant's conduct must amount to a crime or an independent tort. However, there are exceptions to this general rule. The court noted one exception, not applicable here, but explicitly left open whether any others existed. The court went on, however, to discuss what it has in mind when it says "more culpable" by pointing to the seminal case in this area, *Guard–Life Corp. v. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 193, 428 N.Y.S.2d 628, 406 N.E.2d 445 (N.Y.1980), which followed the Restatement (Second) of Torts § 768.

The Restatement refers to antitrust considerations explicitly. First, as cited by *Carvel,* Restatement § 767 Comment c lists factors in determining whether interference is proper, including unlawful conduct.

> Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper. This may be true, for example, of conduct that is in violation of antitrust provisions or is in restraint of trade....

Second, section 768 provides an explanation of when conduct is properly characterized as competitive, as opposed to tortious:

> (a) the relation concerns a matter involved in the competition between the actor and the other, and (b) the actor does not employ wrongful means, and (c) his action does not create or continue an unlawful restraint of trade, and (d) his purpose is at least in part to advance his interest in competing with the other.

Comment (f) elaborates on the third element, unlawful restraint of trade. After noting the various federal statutes, including the Sherman Act §§ 1 and 2, that address antitrust law it states, "[a]ll of this legislation and the very extensive case law that has developed as a gloss upon it are pertinent to a great number of the cases in which this Section may be applicable."

Assuming that this is one such case, plaintiff's claim still fails. Despite the holding above that questions of fact remain as to whether the exclusive contracts unreasonably restrained trade, by itself the MVP contract could not have restrained trade for purposes of antitrust law. Plaintiffs fail to allege that it restrains any particular portion of the market. A review of the record reveals that, if the contract did illegally restrain part of the market, no reasonable fact finder could infer that the restraint was significant under antitrust law.

Presuming that plaintiff intended the restraint to apply to the market as defined

for its exclusive dealing claim, the market for commercial payers, the parties do not dispute the fact that MVP patients make up 8–9% of Rome Hospital's total admissions. What percentage of the commercial payer mix that represents is not represented, but it is not plausible that it approaches the 40% of the total market foreclosure standard that courts consider in evaluating unreasonable restraints of trade.

Absent a showing of culpable conduct sufficient to satisfy the third element of the tortious interference with business relations, this cause of action fails and defendants' motion for summary judgment will be granted.

## IV. *CONCLUSION*

Defendants' conduct could be found to be a substantial factor in causing a material injury to RASC. Furthermore, that injury is properly considered an antitrust injury. Plaintiff has met the standing requirement.

Under a rule of reason analysis, questions of fact remain as to whether Rome Hospital's exclusive contracts for ambulatory surgery with the third party payers, MVP and BCBS, had anticompetitive effects, unreasonably restrained trade, or were justified by procompetitive effects. Plaintiff has also raised triable issues as to all three requirements of the attempted monopolization claim; anticompetitive conduct, defendants' procompetitive justification and whether defendants had a dangerous probability of success. Finally, questions of fact remain as to whether the Hospital engaged in a conspiracy with RMG, or other cooperating physicians, to monopolize the outpatient surgery market.

Plaintiff failed to provide sufficient allegations of coercion to support its tying claims. Plaintiff abandoned its market allocation claim in failing to respond. Under a rule of reason analysis, plaintiff failed to

raise a material issue as to anticompetitive effects of the alleged conspiracy to restrain trade. There are insufficient facts to infer that competition was actually restrained, and if so, to what extent that might have occurred to support a finding that it was unreasonable. Plaintiff's per se boycott claim fails because it was not properly supported by evidence of a horizontal agreement to trigger per se treatment. Finally, the monopoly leveraging and monopolization claims fail because plaintiff did not demonstrate monopoly power in the inpatient surgery market.

The state law claim for intentional interference with contractual relations fails because the action requires demonstration of a breach of contract, and no breach occurred. To support its state law tortious interference with business relations claim, plaintiff had to demonstrate an underlying antitrust claim for restraint of trade. As plaintiff pleaded the claim concerning the MVP contract, it is unable to demonstrate an unreasonable amount of the market was foreclosed by the contract.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED in part, and DENIED in part, as follows:

 a. The *First, Second, Fourth, Fifth, Sixth, Seventh, Ninth, Eleventh* and *Twelfth* causes of action are DISMISSED;

 b. The *Third, Eighth,* and *Tenth* causes of action are NOT DISMISSED.

2. Plaintiff's motion for summary judgment as to the *Fifth* and *Tenth* causes of action is DENIED.

IT IS SO ORDERED.